Exhibit A

Page 1

1

2          In the United States District Court

3              Western District of Missouri

4

5       FRANK A. OROPEZA,

6

7                    PLAINTIFF,

8

9       vs.            Cause No. 4:16-CV-01013

10

11      BNSF RAILWAY COMPANY,

12

13                    DEFENDANT.

14

15

16          Deposition of FRANK A. OROPEZA

17          MAY 1, 2017

18                Taken at:

19            Thornberry Brown

20         4550 Main Street, Kansas City

21        Margaret M. Perry, MO & IL CSR

22

23

24

    Job No. CS2602614

25

Veritext Legal Solutions

800-567-8658                                                973-410-4040

Case 4:16-cv-01013-GAF   Document 31-1   Filed 06/16/17   Page 1 of 39

1     In the United States District Court

2      Western District of Missouri

3

4    FRANK A. OROPEZA,

5

6      PLAINTIFF,

7

8    vs.      Cause No. 4:16-CV-01013

9

10   BNSF RAILWAY COMPANY,

11

12     DEFENDANT.

13

14     Deposition of FRANK A. OROPEZA, taken on

15  behalf of the DEFENDANT, on MAY 1, 2017, between

16  the hours of 9:30 a.m. and 2:00 p.m. before

17  Margaret M. Perry, Missouri CCR #948, and Notary

18  Public within and for the State of Missouri.

1  APPEARANCES OF COUNSEL:

2

3     For DEFENDANT:

4     Mr. David C. Vogel

5     Constangy Brooks Smith & Prophete

6     2600 Grand Boulevard, Suite 750

7     Kansas City, Missouri 64108

8     (816) 472-6400

9     dvogel@constangy.com

10

11    FOR PLAINTIFF:

12    Mr. Stephen C. Thornberry

13    Thornberry Brown

14    4500 Main Street, Suite 205

15    Kansas City, Missouri 64111

16    steve@thornberrybrown.com

2           INDEX

4            PAGE

6  Examination by Mr. Vogel    6

8  DEFENDANT'S EXHIBIT INDEX

10  Exhibit 1 - First Amended Complaint  16

11  Exhibit 2 - Employee Transcript    19

12  Exhibit 3 - System General Notice    23

13  Exhibit 4 - FML Policy      29

14  Exhibit 5 - Safety Rules     31

15  Exhibit 6 - G-COR Rules     33

16  Exhibit 7 - PEPA Policy     34

17  Exhibit 8 - Brandon Ogden letter    57

18  Exhibit 9 -

19  Healthcare Provider Certificate    61

20  Exhibit 10 -

21  Notification from HR BPT    66

22  Exhibit 11 - George Wright letter    71

23  Exhibit 12 - Dubinsky certificate    77

24  Exhibit 13 - HR BPT letter    82

25  Exhibit 14 - Dubinsky certificate    85

1  Exhibit 15 - HR BPT letter    86

2  Exhibit 16 - Wright letter    91

3  Exhibit 17 -

4  Investigative Hearing Transcript   101

5  Exhibit 18 - FMLA leave request    105

6  Exhibit 19 - FMLA lay-off    114

7  Exhibit 20 - e-mail string   116

8  Exhibit 21 - Cargill e-mail   123

9  Exhibit 22 - Dubinsky cert   125

10  Exhibit 23 - HR BPT letter   132

11  Exhibit 24 - Jenkins letter   144

12  Exhibit 25 - Jenkins letter   144

Case 4:16-cv-01013-GAF   Document 91-1 Filed 06/16/17   Page 2 of 39
Veritext Legal Solutions
800-567-8658                                973-410-4040

1         FRANK A. OROPEZA,
2       of lawful age, having been first duly
3 sworn to testify the truth, the whole truth, and
4 nothing but the truth in the case aforesaid,
5 deposes and says in reply to oral
6 interrogatories propounded as follows, to-wit:
7         EXAMINATION
8     QUESTIONS BY MR. VOGEL:
9   Q.  Could you state your full name, please?
10   A.  Yes.  Frank A. Oropeza.
11   Q.  What does the A stand for?
12   A.  Anthony.
13   Q.  And Mr. Oropeza, do you understand the
14 oath you were just administered?
15   A.  Yes.
16   Q.  And you understand that's an oath to tell
17 the truth just as if we were sitting in a courtroom
18 rather than a conference room, right?
19   A.  Yes.
20   Q.  Have you ever given a deposition before?
21   A.  No.
22   Q.  Have you ever testified in court before?
23   A.  No.
24   Q.  All right.  I'll hopefully spend most of
25 the day asking questions rather than talking, but I

1 want to talk about what we're doing here today.
2   A.  Okay.
3   Q.  I want you to understand that our office,
4 Heather Miller and I represent BNSF Railway Company
5 in the lawsuit that's been filed on your behalf
6 against the company, you understand that, right?
7   A.  Yes.
8   Q.  And do you understand you're giving sworn
9 testimony today in connection with that case?
10   A.  Yes.
11   Q.  And you understand that our Court Reporter
12 Peggy is taking down every word that anyone says
13 while we are on the record and that it will almost
14 certainly be put into a transcript form that you
15 will have an opportunity to review, do you
16 understand that?
17   A.  Yes.
18   Q.  And do you understand that that
19 transcript, if the case proceeds and as the case
20 proceeds, can be utilized as we move forward in the
21 case?
22   A.  Yes.
23   Q.  So if, and I'm not saying this would
24 happen, if you were to say something different down
25 the road than you say today, for example, we can

1 bring out the transcript and point that out, does
2 that make sense?
3   A.  Yes.
4   Q.  I want to make sure you understand my
5 questions, I ask bad questions on occasion,
6 especially as the hours go by, if you don't
7 understand my question, will you please tell me?
8   A.  Yes.
9   Q.  And if you do go ahead and answer my
10 question, is it fair to assume that you understood
11 it?
12   A.  Yes.
13   Q.  Yes.  You're doing a great job so far,
14 let's talk one at a time, people tend to talk over
15 each other in every day conversation, not because
16 they're rude, but you'll notice after this that
17 maybe that people see what's coming and begin to
18 answer a question before it might be fully asked.
19 If you speak over me, I might hold up my hand and
20 say "let me finish my question", I'm not doing that
21 to be a tough guy or argue with you, I'm doing it
22 so we have a clean record.
23   A.  Okay.
24   Q.  And then if you can continue as you're
25 doing answering out loud with a yes or a no or

1 whatever the proper words are as opposed to the
2 famous uh-huh or huh-uh which human beings also use
3 every day, if you do that, I may say "is that a yes
4 or is that a no", which again might sound like I'm
5 being a tough guy, but I'm not, I just want to make
6 sure we have a clean record, make sense?
7   A.  Yes.
8   Q.  I tend to take a break every 60 to 90
9 minutes whether we need it or not, you shouldn't be
10 limited by my decisions regarding breaks, if you
11 need a break for whatever reason, just let me know
12 that you'd like to take a break, I may ask that you
13 answer question or two before we do so, but we'll
14 get a break real quick, okay?
15   A.  Fair.
16   Q.  Okay.  Are you under the effect of any
17 medication or any substance that would affect your
18 ability, to your knowledge, to hear, understand and
19 give full and complete and truthful answers to my
20 questions?
21   A.  No.
22   Q.  Is there any reason you might not be able
23 to give full and truthful answers to my questions
24 today?
25   A.  None.

Case 4:16-cv-01013-GAF    Document 83-1 Filed on 06/16/17    Page 3 of 39
Veritext Legal Solutions
800-567-8658                                     973-410-4040

1    Q.  All right.  I'm going to, sometimes
2  there's documents that say a lot of things and I'm
3  not necessarily looking to paper the record with
4  tons of documents, so I'm going to go through some
5  stuff that hopefully we can agree on, but if we
6  don't, during a break or something, we can look at
7  the documents backing it up.  I've looked at some
8  records and I'm careful not to put anyone's exact
9  date of birth on the record if I can avoid it, but
10 you were born in 1976?
11    A.  That's correct.
12    Q.  And you're an even 40?
13    A.  Yes.
14    Q.  And you self-identify as Hispanic,
15 correct?
16    A.  Yes.
17    Q.  Are you still living in Gladstone?
18    A.  Yes.
19    Q.  And do you still live on 73rd Street?
20    A.  That is correct.
21    Q.  How long have you lived there?
22    A.  About four years.
23    Q.  Who lives there with you?
24    A.  My wife and my kids.
25    Q.  What's your wife's name?

1    A.  Raquel, R-A-Q-U-E-L.
2    Q.  And I don't want to know any of the kids'
3  names, but how old are they?
4    A.  20, 17, 15, and 7 -- I'm sorry, 8, I'm
5  sorry, he just turned 8.
6    Q.  That's fair enough.  How long have you and
7  Raquel been married?
8    A.  It will be three years.
9    Q.  Is that your only marriage?
10    A.  Yes.
11    Q.  Has Raquel ever worked for BNSF?
12    A.  No.
13    Q.  And the only one that could possibly be, I
14 think would be the 20-year old, has the 20-year old
15 ever worked for BNSF?
16    A.  No.
17    Q.  Have your wife and children lived with you
18 on 73rd Street the entire time you've lived there?
19    A.  Yes.
20    Q.  Has anyone else lived there during that
21 time?
22    A.  No.
23    Q.  Did your mother ever live there?
24    A.  She lived there for about maybe six, six
25 months, six or seven months.

1    Q.  Can you approximate the period of time
2  that was?
3    A.  No.
4    Q.  So if we're going back four years, you've
5  lived there since about the spring of 2013?
6    A.  Yes.
7    Q.  Thereabouts?
8    A.  Yes.
9    Q.  Before that, where did you live?
10    A.  It was in Kansas City, Kansas.
11    Q.  And how long did you live at the Kansas
12 City, Kansas address?
13    A.  I want to say maybe five, five years, I
14 believe.
15    Q.  Okay.  And other than your wife and
16 children, did anyone else live in that residence
17 during the time you lived there?
18    A.  Yes, my mother.
19    Q.  Okay.  Did she live there the whole time?
20    A.  Yes.
21    Q.  And anyone else?
22    A.  That was it.
23    Q.  Okay.  Do you have any siblings?
24    A.  I have a sister.
25    Q.  Does she live in the Kansas City area?

1    A.  Olathe.
2    Q.  I count that as the Kansas City area.
3    A.  Okay.
4    Q.  Has she lived in Olathe or somewhere else
5  in the Kansas City area for the past, I'm sort of
6  taking the time you lived at the two residences you
7  identified, nine years?
8    A.  Yes.
9    Q.  How old is she approximately?
10    A.  27, 26.
11    Q.  And has she ever worked for BNSF?
12    A.  No.
13    Q.  Are you a high school graduate?
14    A.  Yes.
15    Q.  Where did you go and when did you
16 graduate?
17    A.  I went to Bishop Miege, and graduated in
18 '95.
19    Q.  Any post high school education?
20    A.  No.
21    Q.  Did you ever serve in the military?
22    A.  No.
23    Q.  Ever had any legal training?
24    A.  No.
25    Q.  Other than this case, have you ever sued

Page 14

1  anyone before?
2     A.  No.
3     Q.  Have you ever been sued?
4     A.  No.
5     Q.  Have you ever filed for bankruptcy?
6     A.  No.
7     Q.  Have you ever been convicted of a crime
8  other than a traffic violation?
9     A.  No.
10    Q.  We'll be done in 20 minutes.  Just
11 kidding.  Okay.  I'm not entitled to nor do I want
12 to know about any communications you've had with
13 Mr. Thornberry or anybody who works with him, do
14 you understand that?
15    A.  Yes.
16    Q.  So don't interpret any of my questions to
17 refer to that, you don't even have to tell me that,
18 make sense?
19    A.  Okay.
20       MR. THORNBERRY:  That was the thing I
21 forgot to tell you, I was thinking on the car ride
22 here, I couldn't remember it.
23    Q.  (By Mr. Vogel)  I'm sure Mr. Thornberry
24 would jump in if he thought we were going there.
25 But without going into any communication you've had

Page 15

1  with Mr. Thornberry in preparation for your
2  deposition today, did you review any documents?
3     A.  No.
4     Q.  Okay.  Did you bring any documents with
5  you?
6     A.  No.
7     Q.  Did you speak with any current or former
8  BNSF employees about the fact that you're giving a
9  deposition today?
10    A.  No.
11    Q.  Did you talk to them about your case at
12 all?
13    A.  No.
14    Q.  Have you provided to Mr. Thornberry or
15 someone who works with him all of the documents
16 that you have that you believe are relevant to your
17 claims?
18    A.  Yes.
19    Q.  Did you ever tape record any BNSF
20 employees?
21    A.  No.
22    Q.  And I always ask this now even though it
23 probably doesn't need to be asked, but in addition
24 to hard copy paper documents, sometimes people have
25 things on their computer which I refer to as soft

Page 16

1  copies, do you know what I'm talking about?
2     A.  Yes.
3     Q.  And sometime they say "I didn't know I
4  needed to pull those things".
5     A.  Okay.
6     Q.  Did you ever reduce to hard copy, have you
7  provided that, to the extent you have anything
8  regarding your claims to Mr. Thornberry?
9     A.  No.
10    Q.  Okay.
11       (Defendant's Exhibit 1 marked for
12          identification)
13    Q.  (By Mr. Vogel)  Throughout the day, Mr.
14 Oropeza, I'll hand you documents, I have copies for
15 your counsel as well, and you certainly have the
16 right to review any document I give you today.
17    A.  Okay.
18    Q.  But this one I might be able to simplify.
19 I'm handing you what's been marked as Exhibit 1,
20 which I think your counsel and I can agree is a
21 copy of a First Amended Complaint, which is part of
22 the lawsuit that was filed on your behalf against
23 BNSF back in January of 2017, is that what that
24 document appears to be?
25    A.  Yes.

Page 17

1     Q.  Okay.  Have you seen that document before?
2     A.  Yes.
3     Q.  And what I'd kind of like to do to start
4  our day off is make sure we're on the same page in
5  terms of sort of an overview of what your claims
6  are against BNSF, okay?
7     A.  Okay.
8     Q.  I think one of the things you're claiming
9  is that BNSF violated your rights under the Family
10 and Medical Leave Act, is that one of the things
11 you're claiming?
12    A.  That's correct.
13    Q.  Okay.  And based on the language in this
14 First Amended Complaint, you are contending that
15 BNSF interfered with your ability to take FMLA
16 leave, correct?
17    A.  Yes.
18    Q.  Retaliated against you for taking FMLA
19 leave, correct?
20    A.  That's correct.
21    Q.  And you're also alleging that BNSF
22 discriminated against you because you are Hispanic,
23 correct?
24    A.  That's correct.
25    Q.  Is there anything else in terms of a big

5 (Pages 14 - 17)

1 picture sense, I've sort of paraphrased the three
2 counts of this Amended Complaint, is there anything
3 else, to your knowledge, sort of in the big picture
4 sense that you're suing BNSF for?
5    A.   No.
6    Q.   Can you tell me the names of the people
7 who you believe interfered with your ability to
8 take FMLA?
9    A.   Superintendent Joe Dickerson, Assistant
10 Superintendent I believe was Jim Tylick, and I
11 believe his name was Darren Compton, I don't know
12 his title.
13    Q.   Do you believe those three individuals
14 also retaliated against you for taking FMLA leave?
15    A.   Yes.
16    Q.   Anyone else who you believe retaliated
17 against you for taking FMLA leave?
18    A.   No.
19    Q.   Let's see if I can shortcut it.  Are those
20 the same people who you believe discriminated
21 against you because you are Hispanic?
22    A.   Yes.
23    Q.   Anyone else?
24    A.   No.
25    Q.   I'm going to go into some more details of

1 it, but you began working for BNSF in July of 2002,
2 is that correct?
3    A.   Yes, that is correct.
4    Q.   And you were in your mid-20s at that time?
5    A.   Yes.
6    Q.   Okay.  And I know you had some jobs before
7 that, what I want to ask is; were any of your prior
8 jobs, and I'm going from after high school forward,
9 were there any jobs post high school that you had
10 that you were involuntarily terminated from?
11    A.   No.
12    Q.   Did you ever bring a charge or a lawsuit
13 against a prior employer?
14    A.   No.
15    Q.   Did you ever use FMLA leave with prior
16 employers?
17    A.   No.
18    Q.   Even if you didn't bring a charge or a
19 lawsuit, did you ever claim any kind of
20 discrimination against a prior employer?
21    A.   No.
22         (Defendant's Exhibit 2 marked for
23             identification)
24    Q.   (By Mr. Vogel)  Sir, I'm handing you
25 what's been marked as Exhibit 2, and some of the

1 documents that your counsel and I have produced to
2 one another have some kind of control numbers in
3 the lower right-hand corner, so this is something
4 that's numbered for production D42 to 47, which
5 I'll represent to you D stands for defendant, so
6 it's something that BNSF produced, and it's a copy
7 of what's called an Employee Transcript for you.
8 Have you ever seen this document before?
9    A.   Yes.
10    Q.   And do you have any reason to question
11 that this is an authentic copy of an Employee
12 Transcript for you that looks like it was printed
13 in the August of 2015 time frame?
14    A.   No.
15    Q.   Okay.  If we look at this, just to draw a
16 little framework, the first page and a half is just
17 a series of job titles that you had and locations
18 at which you worked, right?
19    A.   That's correct.
20    Q.   And then from about the middle of the
21 second page until about two/thirds of the way down
22 the third page, that's some disciplinary history
23 that you had, is that correct?
24    A.   Yes, that's correct.
25    Q.   And then the remaining pages are a whole

1 bunch of training courses that you had, correct?
2    A.   Yes, that is correct.
3    Q.   And were these documents, I'm not sure if
4 I've ever asked this before, is this something you
5 can access when you worked at BNSF?
6    A.   If I asked for it, not by me manually.
7    Q.   Got you.  Well, according to this
8 document, it indicates, as we just touched on, that
9 you started with BNSF in July of 2002 as a
10 conductor in Kansas City, Kansas, correct?
11    A.   That's correct.
12    Q.   Do you remember who hired you?
13    A.   No, I don't recall their name.
14    Q.   Okay.  Do you know if Mr. Dickerson or Mr.
15 Tylick were involved in your hiring?
16    A.   No.
17    Q.   You don't recall or they weren't?
18    A.   No, they weren't involved.  I'm sorry.
19    Q.   No, that's okay, it wasn't a very good
20 question.  Same thing for Mr. Compton, he was not
21 involved in your hiring?
22    A.   No, he wasn't.
23    Q.   And if I'm reading this Employee
24 Transcript correctly, it looks like you did some
25 work as a brakeman and a switchman at times, is

1 that correct?
2 A. Yes.
3 Q. And then in January of 2005, you became an
4 engineer?
5 A. Yes.
6 Q. And you pretty much held the engineer
7 title until your dismissal from employment, is that
8 right?
9 A. That's correct.
10 Q. And the whole time you worked for BNSF,
11 were you in what is referred to as a scheduled
12 position?
13 A. Yes.
14 Q. And a scheduled position is a job in which
15 you're effectively paid by the hour?
16 A. It's considered mileage which is
17 technically hourly.
18 Q. You're a member of a union as a scheduled
19 employee, correct?
20 A. Yes.
21 Q. What union is that?
22 A. BLET 502.
23 Q. So just drawing the distinction, I know
24 there's different ways they pay folks, but you were
25 sort of on the hourly side as opposed to the

1 management side, right?
2 A. That's correct.
3 Q. And if I'm reading it correctly, your
4 entire service with BNSF was generally performed in
5 the Kansas City area?
6 A. That's correct.
7 Q. Do you remember the first time you took
8 FMLA leave, in terms of a year, after you started
9 in 2002?
10 A. No.
11 (Defendant's Exhibit 3 marked for
12 identification)
13 Q. (By Mr. Vogel) I'm going to hand you
14 what's been marked as Exhibit 3 to your deposition,
15 which is a multi page document numbered for
16 production E281 to 286 and it says at the top
17 System General Notice/73 all divisions, have you
18 ever seen this document before?
19 A. Yes.
20 Q. Okay. And in what context have you seen
21 this document?
22 A. On the computer system through work.
23 Q. Okay. This was something that you could
24 access as an employee on BNSF's information system,
25 is that fair to say?

1 A. Yes.
2 Q. And do you agree with me that this sort of
3 summarizes some of the policies at BNSF, at least
4 as of November of 2014, regarding leaves of
5 absence?
6 A. Yes.
7 Q. And I want you to turn to the second page,
8 I'm really going to ask you about language on the
9 second and third page regarding the section that
10 says Family and Medical Leave, FMLA, do you see
11 that?
12 A. Yes.
13 Q. This document, the first paragraph talks
14 about how an employee can be eligible for the FMLA,
15 right?
16 A. That's correct.
17 Q. And it indicates in that paragraph that if
18 you're applying for FMLA for your own health
19 condition, you apply for a medical leave, correct?
20 A. That's correct.
21 Q. Okay. But most of what we're going to be
22 talking about today are situations in which you
23 applied for FMLA in situations where it was not for
24 your own health condition, is that correct?
25 A. That's correct.

1 Q. You applied for FMLA because of a family
2 member's health condition, correct?
3 A. That's correct.
4 Q. Specifically your mother?
5 A. That's correct.
6 Q. Okay. And that's, part of that is covered
7 there in the second paragraph of the section that
8 we're talking about, correct?
9 A. That's correct.
10 Q. Okay. What they're saying there is if
11 you're taking leave for a health condition that's
12 not your own, you need to complete a Notice of
13 Intent to take paid/unpaid family/medical leave and
14 it indicates that's a form, correct?
15 A. Yes.
16 Q. And you were familiar with that form and
17 knew how to get that form, right?
18 A. Yes.
19 Q. And you knew how to complete it, right?
20 A. Yes.
21 Q. And then after the word "form", it says
22 "and mail or fax the completed form to the
23 attention of the Benefits Processing Team in Fort
24 Worth". Fort Worth, Texas is the sort of corporate
25 national headquarters for BNSF, correct?

7 (Pages 22 - 25)

1   A.   Yes.
2   Q.   And that is, apparently we can presume,
3   based on this document, where a group of folks
4   called the Benefits Processing Team is located,
5   right?
6   A.   That's correct.
7   Q.   And it also says "to provide that Notice
8   of Intent from to your supervisor", correct?
9   A.   Yes.
10   Q.   And you always knew who your supervisor
11   was, right?
12   A.   Yes.
13   Q.   And then the last sentence of that
14   paragraph says "in addition, a Certification of
15   Healthcare Provider should be completed by the
16   employee's physician or family member's physician",
17   correct?
18   A.   That's correct.
19   Q.   And you knew what that certification form
20   was, correct?
21   A.   Yes.
22   Q.   And that's something that you arranged to
23   have completed multiple times during your
24   employment, correct?
25   A.   That's correct.

1   Q.   And when it was completed, what we're
2   going to be talking about today was completed by
3   the healthcare provider who cared for your mother,
4   is that correct?
5   A.   That's correct.
6   Q.   And it says on the next paragraph "the
7   fully completed certification of" -- I think you
8   skipped ahead one, not the next page, the next
9   paragraph, just to make sure.
10   A.   Okay.
11   Q.   "The fully completed Certification of
12   Healthcare Provider form must be forwarded directly
13   from the physician's office for review and must be
14   received within 15 days of Request For Leave.
15   Faxes from a doctor's office are preferred, the fax
16   number is on the bottom of the certification form",
17   did I read that right?
18   A.   Yes.
19   Q.   And what it doesn't say on there is where
20   it's supposed to be faxed to and I think we're
21   going to talk about that on another document, but
22   did you know where the certification form was
23   supposed to be faxed?
24   A.   It was supposed to be faxed to the BNSF
25   processing team.

1   Q.   In Forth Worth, right?
2   A.   Yes, in Fort Worth.
3   Q.   And it didn't go to your supervisor,
4   right?
5   A.   That's correct.
6   Q.   And it did not go to your local management
7   team, to your knowledge?
8   A.   Yes, that's correct.
9   Q.   Now, let's look at the next page of that
10   document, which is numbered D-283 and it's Page 3
11   of 6 of the whole document.  The first full
12   paragraph at the top of that page says "the
13   employee requesting leave will receive a written
14   notification indicating whether the leave has been
15   granted or denied".  And you always got a written
16   notification indicating whether leave that you had
17   requested had been granted or denied, correct?
18   A.   Yes.
19   Q.   And it says on there that "the benefits
20   department may be contacted at", and there's a
21   couple of phone numbers there if there were any
22   questions, so you always had access to a telephone
23   number including a toll-free numbers that you could
24   use to contact that benefits department if you had
25   any questions, right?

1   A.   That's correct.
2        (Defendant's Exhibit 4 marked for
3             identification)
4   Q.   (By Mr. Vogel)  I'm going to hand you
5   what's been marked as Exhibit 4, it's a four-page
6   document numbered for production D-310 to D-313,
7   which has the BNSF heading at the top and it says
8   "policy name Family and Medical Leave policy", is
9   this a document that you saw during your employment
10   at BNSF?
11   A.   Yes.
12   Q.   Okay.  And I want to go to the third page
13   of this document, which says "employee application
14   process", the heading there, do you see that?
15   A.   Yes.
16   Q.   And it talks about some of the same things
17   that we were just looking at in that prior
18   document, right?
19   A.   That's correct.
20   Q.   And what I just want to ask you about in
21   there is, again this says that "the Certification
22   of Healthcare Provider form is going to go to the
23   HR benefits processing people in Fort Worth and the
24   employer's response will be prepared by the HR
25   Benefits Processing Team also in Fort Worth",

1 right?
2    A.   That's correct.
3    Q.   Okay.  And what I want to ask is; are you
4 aware of any facts that would suggest that your
5 supervisors, your local management team, played any
6 role in the review of certifications that were sent
7 to Fort Worth, or preparing the response to your
8 Request For Leave?
9    A.   No.
10   Q.   Do you know if your managers and
11 supervisors, what I'll kind all your local
12 leadership team, do you know if any of them ever
13 even saw the certification forms that you provided
14 to BNSF?
15   A.   No, I don't.
16   Q.   Were you familiar with something during
17 your employment referred to as Employee Safety
18 Rules?
19   A.   Yes.
20   Q.   How did you become familiar with Employee
21 Safety Rules?
22   A.   They were handed to us at orientation when
23 I first got hired on.
24   Q.   This would be something that you were
25 actually given a hard copy of?

1    A.   Yes.
2       (Defendant's Exhibit 5 marked for
3        identification)
4    Q.   (By Mr. Vogel) I'm going to hand you a
5 document that's been marked as Exhibit 5, which is
6 the production Number D-268, it's a little
7 confusing, but someone's handwritten at the top
8 there says Exhibit 10 and you understand that's
9 because this was used as an exhibit in the course
10 of a formal investigative hearing regarding your
11 employment?
12   A.   Yes, I do.
13   Q.   And this is a page of, I believe what we
14 were just referring to as the Employee Safety
15 Rules, do you agree with that?
16   A.   Yes.
17   Q.   And up at the top, it says G-COR, do you
18 know what that stands for?
19   A.   It's G-COR, which is general, I don't, I
20 don't recall what it means.
21   Q.   Code of Operating Rules?
22   A.   Yes, there you go.
23   Q.   In any event, these were the rules that
24 you were familiar with that governed, at least in
25 part, your employment with the railroad, correct?

1    A.   That's correct.
2    Q.   Okay.  And there's one on there that says
3 1.13 "reporting and complying with instructions",
4 do you see that?
5    A.   Yes.
6    Q.   It states "employees will report to and
7 comply with instructions from supervisors who have
8 the proper jurisdiction.  Employees will comply
9 with instructions issued by managers of various
10 departments when the instructions apply to their
11 duties", did I read that correctly?
12   A.   That's correct.
13   Q.   And did you understand that rule?
14   A.   Yes.
15   Q.   And did you understand that was one of the
16 rules that covered you?
17   A.   Yes.
18   Q.   And if we jump two down, there's rule 1.15
19 that says "duty reporting or absence", correct?
20   A.   Yes.
21   Q.   And it says "employees must report for
22 duty at the designated time and place with the
23 necessary equipment to perform their duties", have
24 I read that correctly?
25   A.   Yes.

1    Q.   And there's, I'm going to skip a couple of
2 sentences, it will be in the record as part of the
3 document, but the last sentence says "continued
4 failure by employees to protect their employment
5 will be cause for dismissal", right?
6    A.   That's correct.
7    Q.   And that's a rule that you understood,
8 correct?
9    A.   Yes.
10   Q.   And that's a rule that you understood
11 applied to you during your employment with BNSF,
12 right?
13   A.   Yes.
14       (Defendant's Exhibit 6 marked for
15        identification)
16   Q.   (By Mr. Vogel)  Let me hand you what's
17 been marked as Exhibit 6, it's a one-page document
18 with the production Number D-269, which was used as
19 an Exhibit 11 in one of the formal investigative
20 hearings governing your employment, correct?
21   A.   That's correct.
22   Q.   This is another page from the G-COR rules,
23 correct?
24   A.   That's correct.
25   Q.   The one I want to talk about is Rule 1.6

Page 34

1 that says "conduct", do you see that?
2     A.  Yes.
3     Q.  And one thing it says is "employees must
4 not be" and there's a whole list on there, and one
5 thing says "insubordinate", correct?
6     A.  That's correct.
7     Q.  And then at the bottom it says "any act of
8 hostility, misconduct or willful disregard or
9 negligence effecting the interest of the company or
10 its employees is cause for dismissal and must be
11 reported is in regard, indifference to duty or the
12 performance of duty will not be tolerated", right?
13     A.  That's correct.
14     Q.  And you understood that rule?
15     A.  Yes.
16     Q.  And you understood that applied to you,
17 correct?
18     A.  Yes.
19     (Defendant's Exhibit 7 marked for
20         identification)
21     Q.  (By Mr. Vogel)  Let me hand you Exhibit 7,
22 which is a multi-page document, D-475 to 480, and
23 it says on the front "policy for employee
24 performance accountability".  Have you ever seen
25 this document before?

Page 35

1     A.  Yes.
2     Q.  Okay.  And that is a copy of a policy that
3 is sometimes short-handed as the PEPA policy,
4 correct?
5     A.  That's right.
6     Q.  P-E-P-A, right?
7     A.  That's correct.
8     Q.  And this was a policy that governed your
9 employment as a scheduled employee, correct?
10     A.  That's correct.
11     Q.  And basically it's a multi-page document,
12 and it will be in the record, but this talks about
13 the various types of discipline -- I'm sorry, is
14 the various types of conduct for which an employee
15 can be disciplined and it talks about the various
16 steps that could lead to various penalties
17 including dismissal, correct?
18     A.  That's correct.
19     Q.  And there's some categories of discipline
20 there, I want to turn to Page 4 of the document,
21 which is numbered D-478 and there's a category
22 there called "serious violations", do you see that?
23     A.  Yes.
24     Q.  And it indicates in the document under
25 progression that the first serious violation will

Page 36

1 result in a 30-day record suspension and a review
2 period of 36 months, and there's an exception
3 there, but I read the first sentence correctly,
4 right?
5     A.  That's correct.
6     Q.  Okay.  And a review period, do you agree
7 with me that that's kind of like a probationary
8 period?
9     A.  Yes.
10     Q.  And then the next paragraph says "a second
11 serious violation committed within the applicable
12 review period may result in dismissal", I read that
13 correctly, right?
14     A.  That's correct.
15     Q.  All right.  So it sort of speaks for
16 itself, but it indicates that if an employee, a
17 scheduled employee, is assessed a serious
18 violation, they're generally going to be given a
19 three-year probationary period that goes along with
20 that serious violation, right?
21     A.  That's correct.
22     Q.  And what they receive in terms of a
23 penalty is what's called a 30-day record
24 suspension, which generally means that's just
25 written on your record, right, you don't actually

Page 37

1 serve 30 days off?
2     A.  That's correct.
3     Q.  But if you get a second serious violation
4 within that three-year probationary period, that,
5 and it's permissive there, it says "may", but that
6 can result in dismissal, which is termination,
7 right?
8     A.  That's correct.
9     Q.  And that was something you were familiar
10 with during your employment, correct?
11     A.  Yes.
12     Q.  I want to, and I'm not going to introduce
13 a bunch of documents about it, but I want to spend
14 a few minutes using the Employee Transcript we
15 introduced a few minutes ago and talk about your
16 prior disciplinary history before we get into some
17 of the details of things that brings us here today.
18 So at the, under the discipline heading on the
19 transcript, the first one on there is July 7th of
20 2006, correct?
21     A.  That's correct.
22     Q.  And it indicates there that you received a
23 formal reprimand for violating the attendance
24 guidelines for exceeding a three-month threshold
25 for the period ending May 31st, 2006, that's

10 (Pages 34 - 37)

Page 38

1 generally what it says, correct?
2   A.  That's correct.
3   Q.  Can you explain to me, as you understand
4 it, what does that mean?
5   A.  Basically I took time off work in that
6 three months, you're allowed three months, and so
7 many days off you can have in that three-month
8 period.
9   Q.  So the way at this time that BNSF sort of
10 had the attendance guidelines was they looked at it
11 in three-month windows?
12   A.  That's correct.
13   Q.  And there was a certain amount of time an
14 employee could miss during that three-month window
15 without getting in trouble?
16   A.  That's correct.
17   Q.  And at least according to this, you had
18 exceeded the allowable amount of absenteeism and so
19 they gave you a formal reprimand?
20   A.  That is correct.
21   Q.  And a formal reprimand, do you consider
22 that kind of a warning?
23   A.  Yes.
24   Q.  Okay.  And then the next entry on there is
25 June 12 -- oh, I'm sorry.  The review period under

Page 39

1 July 7th, 2006 is blank, do you see that, on the
2 employee transcript?
3   A.  Where is it.
4   Q.  If I can point here, there's a heading
5 that says "review period" and there's actually
6 nothing written there on the July 7th, 2006 one,
7 right?
8   A.  That's correct.
9   Q.  Do you know if there was a review period
10 for a formal reprimand for violating the attendance
11 guidelines?
12   A.  I don't recall.
13   Q.  Okay.  The next entry on there is June 12
14 of 2007, right?
15   A.  That's correct.
16   Q.  It indicates there you received a 10-day
17 record suspension for violating the attendance
18 guidelines, and again according to this document,
19 you had exceeded the threshold during a three-month
20 period in 2007, correct?
21   A.  That's correct.
22   Q.  Okay.  And again, as we talked about, a
23 record suspension, you don't actually serve time
24 off, it's just a notation on your disciplinary
25 record, correct?

Page 40

1   A.  That's correct.
2   Q.  And again the review period is blank, is
3 that right?
4   A.  That's correct.
5   Q.  To your recollection, did you challenge or
6 grieve either of those first two disciplinary
7 incidents?
8   A.  Yes.
9   Q.  Okay.  And what, let's go to the first
10 one, in July of 2006, do you remember what it was
11 you did to challenge or grieve that reprimand?
12   A.  We just brought it to their attention in
13 an investigation.
14   Q.  Okay.  You participated in an
15 investigation on that one?
16   A.  I believe so.
17   Q.  Yeah, it says INV there, right, which
18 would indicate you participated in an
19 investigation?
20   A.  Yes.
21   Q.  And for people reading this who have never
22 worked for BNSF or have never seen a case,
23 investigation has kind of formal meaning at BNSF in
24 this context, right?
25   A.  That's correct.

Page 41

1   Q.  And what that means is that you, as a
2 union member, have a right to participate in what
3 is called an investigation before any discipline is
4 imposed, right?
5   A.  That's correct.
6   Q.  That's a right you have under the
7 Collective Bargaining Agreement?
8   A.  That's correct.
9   Q.  That's a situation where you get to
10 actually attend a proceeding along with union
11 representation, right?
12   A.  That's correct.
13   Q.  And you and your union representative have
14 the opportunity to ask questions of witnesses,
15 right?
16   A.  That's correct.
17   Q.  And to introduce documents that you think
18 might help support your case, right?
19   A.  That's correct.
20   Q.  And there's someone who is designated as a
21 hearing officer to sort of preside over the whole
22 thing, right?
23   A.  Yes.
24   Q.  And after that, someone actually prepares
25 a transcript of the whole thing, right?

11 (Pages 38 - 41)

**Page 42**

1   A.  That's correct.
2   Q.  And they make a decision after that
3 investigation as to whether to impose discipline,
4 correct?
5   A.  Yes.
6   Q.  And you recall you did that and the point
7 of doing that is you're not just going to take the
8 discipline, you're challenging it, right?
9   A.  That's correct.
10   Q.  Do you remember why you said you didn't
11 think that discipline was justified?
12   A.  I, I don't remember.
13   Q.  Okay.  And then was it sort of the same
14 thing with regard to the June 12, 2007 discipline,
15 it says there INV again, which would indicate there
16 it was an investigation on that as well?
17   A.  Yes.
18   Q.  And do you remember the reason that you
19 were challenging that record suspension?
20   A.  Yeah, I don't remember.
21   Q.  Okay.  So the next entry on there is
22 December 20th of 2007, do you see that?
23   A.  Yes.
24   Q.  And under the level of discipline, the
25 letter S is there, correct?

**Page 43**

1   A.  That's correct.
2   Q.  Does that indicate a serious violation?
3   A.  I don't recall.
4   Q.  Okay.  And under "review period" for that
5 one, it says 36, correct?
6   A.  That's correct.
7   Q.  And that is, 36 months is three years,
8 right?
9   A.  Yes.
10   Q.  And this indicates that you received a
11 30-day record suspension, correct?
12   A.  Yes.
13   Q.  And what it says there, it says
14 "concerning failure to comply with instructions
15 contained within the certified letter dated
16 November 6th of 2007 concerning FMLA leave", and
17 we're going to talk about a situation with some
18 similarities to that, but do you remember in
19 November of 2007, which I know we're going back
20 almost 10 years, getting a letter from someone
21 named Alden Jenkins regarding your FMLA leave?
22   A.  Yes.
23   Q.  Do you remember that Mr. -- who is Mr.
24 Jenkins?
25   A.  At the time, he was a superintendent.

**Page 44**

1   Q.  And do you remember Mr. Jenkins writing
2 you a letter saying that BNSF believed that
3 although you had been granted FMLA, you were using
4 it in an irregular pattern?
5   A.  Yes.
6   Q.  And that you were using it on weekends or
7 in conjunction with rest days?
8   A.  Yes.
9   Q.  And they requested updated information
10 from a treating doctor within a couple of weeks of
11 that letter, do you remember that?
12   A.  Yes.
13   Q.  Was this a situation where you were taking
14 FMLA to care for your mother?
15   A.  That's correct.
16   Q.  And then did you, I should have asked at
17 the beginning, did you ever take FMLA for yourself?
18   A.  No.
19   Q.  And did you ever take it for any other
20 family member?
21   A.  No.
22   Q.  Okay.  All right.  And just to kind of
23 draw the framework here, and I'm not going to focus
24 very much on the 2007 part, but what they were
25 suggesting there was that you were, what the

**Page 45**

1 implication was was that you were taking an FMLA
2 day to sort of extend time that you already had
3 off, right?
4   A.  Yes.
5   Q.  Because in your role as a conductor,
6 you'll work for multiple days and then you'll have
7 what's called rest days where you get a couple of
8 days off, right?
9   A.  Yes, that's correct.
10   Q.  And I'm assuming, and always steer me the
11 other way if I'm assuming incorrectly, that your
12 position would be that you were taking that FMLA
13 because those were truly days that you needed to
14 care for your mom, right?
15   A.  That's correct.
16   Q.  And you weren't doing to sort of extend a
17 weekend or extend a rest day period, right?
18   A.  That's correct.
19   Q.  Okay.  Do you remember if you went and got
20 anything from your mother's healthcare provider in
21 response to that November 2007 letter from Mr.
22 Jenkins?
23   A.  I believe I had.
24   Q.  Okay.  Who is Marilyn Ehrhardt, do you
25 know who that is?

12 (Pages 42 - 45)

1    A.   I, I don't recall.
2    Q.   All right.  Well, in any event, after this
3  investigation, you were issued the 30-day record
4  suspension and the three-year probationary period
5  and there was a finding that you failed to comply
6  with instructions in that certified letter, is that
7  a fair summary of what they found?
8    A.   Yes.
9    Q.   And do you agree that with a 30-day record
10  suspension with that three-year probationary
11  period, that under the progressive disciplinary
12  rules, you were one step away from potential
13  dismissal at that time?
14    A.   Yes.
15    Q.   Let's go down to the next entry, which is
16  January 16th of 2009, do you see that one?
17    A.   Yes.
18    Q.   That indicates that you got a formal
19  reprimand for again exceeding these three-month
20  attendance guidelines, correct?
21    A.   That's correct.
22    Q.   And they classify that under G-COR 1.13 on
23  this form, do you see that?
24    A.   Yes.
25    Q.   And that's the reporting and complying

1  with instructions rule, right?
2    A.   That's correct.
3    Q.   So BNSF appears to be classifying an
4  attendance violation, do you agree with me, as
5  saying "we told you you have to come to work a
6  certain number of times and you didn't do it", so
7  they're calling that failure to comply with
8  instructions, is that a fair summary?
9    A.   Yes.
10    Q.   And on this one, it indicates you went
11  through an investigation process as well, correct?
12    A.   Yes.
13    Q.   And you, they ended up issuing a formal
14  reprimand, correct?
15    A.   That's correct.
16    Q.   And just to kind of try to shortcut it, we
17  had talked about back in December of 2007 you were
18  one step away from dismissal being the possible
19  next step, but is it your understanding that this
20  went to formal reprimand because a year had passed
21  since the last violation or do you know?
22    A.   Oh, I don't know.
23    Q.   Okay.  You don't know if there's a
24  situation where, for the attendance violations, if
25  one year passes, it sort of falls off your record

1  and you go back to the beginning?
2    A.   My understanding, it's either a year or it
3  just depends on the, when the violation occurs.
4    Q.   Got you.  Because it did indicate in 2007
5  that there was a 36-month review period, right?
6    A.   Yes.
7    Q.   And 2009 would have been within that
8  36-month review period, right?
9    A.   Yes.
10    Q.   Okay.  Let's look at January 22nd, 2009,
11  which is the next thing -- oh, I'm sorry, let me
12  jump back to the January 16th, 2009 one and just
13  ask you if you remember, do you remember if that
14  was a situation when you were using FMLA during
15  that time?
16    A.   I, I don't remember.
17    Q.   Okay.  Let's go to January 22nd of 2009,
18  and it indicates there that you got a 10-day record
19  suspension for laying off on call when called for,
20  and there's a train number there, can you explain
21  what you understand is meant by "laying off on call
22  when called"?
23    A.   Laying off on call means basically they're
24  calling you in a two-hour period from the call on
25  duty time and if you don't answer that call, I

1  believe they lay you off on call.
2    Q.   Okay.  So there are some times when you
3  might not know if you're actually going to work or
4  not, but you're on call, which means you've got to
5  be ready, willing and able to work, is that
6  correct?
7    A.   That's correct.
8    Q.   Okay.  And if you're in an on-call status,
9  if you don't answer the call, that can be deemed an
10  unexcused absence?
11    A.   Yes.
12    Q.   Is there also a situation where if you
13  wait, if the employee waits until they actually get
14  the call, and even though you literally answer it,
15  you say "well, I'm not going to work today, I'm
16  going to take either an FMLA day or a vacation day
17  or something like that", that can also be deemed an
18  unexcused absence?
19    A.   I believe so.
20    Q.   In other words, if you're going to need to
21  take the day off and you're on call, you're
22  supposed to call first and tell them that, right?
23    A.   That's correct.
24    Q.   Do you remember what happened here in this
25  situation on January, what ended up -- sorry, as

13 (Pages 46 - 49)

**Page 50**

1 the January 22nd, 2009 record suspension?
2    A.  I believe, if I can remember right, I
3 actually worked that job and they still, the
4 system, I'm referring to the computer system, still
5 laid me off on call, but I don't remember exact --
6    Q.  Fair enough.  But there's the word
7 "waiver" right there, do you see that under that
8 entry?
9    A.  Yes.
10    Q.  What is, as you understand in BNSF's
11 terminology, a waiver in this context?
12    A.  I believe it is just, you know, like a
13 warning, I want to say.
14    Q.  Well, tell me if you disagree with this,
15 isn't a waiver a situation in which you could take
16 it to an investigation but you sign a paper and say
17 "I'm waiving a my right to go to investigation"?
18    A.  I think so.
19    Q.  So your accepting the discipline that's
20 issued to you without going through the formal
21 challenge process?
22    A.  I believe we, I don't recall if we went to
23 investigation or we had a meeting about it, but I
24 really don't remember that.
25    Q.  Okay.  And then there's one right after

**Page 51**

1 that that says 1/27/2009, a 10-day record
2 suspension for exceeding the attendance guidelines,
3 right?
4    A.  That is correct.
5    Q.  And it shows there was an investigation on
6 that one, correct?
7    A.  That's correct.
8    Q.  Okay.  I don't know if, a line probably
9 got cut off on here, it indicates on April 30th,
10 2009, there's a record suspension for exceeding the
11 attendance guidelines, but I can't see how much of
12 a record suspension that was, do you know what it
13 was?
14    A.  No, I don't.
15    Q.  Okay.  All right.  Well, at the top of
16 what's the third page of the Employee Transcript,
17 the number, it's numbered for production D-44, so
18 the first full one on there, do you see under the
19 June 2nd, 2009 entry?
20    A.  Yes.
21    Q.  And there's, for the type of discipline,
22 there's the capital letter S there, right?
23    A.  That's correct.
24    Q.  It says "suspension actual", which would
25 indicate you actually served time off without being

**Page 52**

1 paid for that time, is that correct?
2    A.  That's correct.
3    Q.  And this was something that occurred after
4 an investigation, right?
5    A.  Yes.
6    Q.  And it indicates that you had exceeded the
7 three-month threshold for attendance guidelines for
8 the period ending April 30, 2009, correct?
9    A.  That's correct.
10    Q.  And what actually happened in this case is
11 you were terminated from employment initially,
12 correct?
13    A.  Yes.
14    Q.  And the word they use at BNSF is
15 dismissal, right?
16    A.  That's correct.
17    Q.  But that's being fired, right?
18    A.  Yes.
19    Q.  So initially they had fired you for this
20 particular attendance violation, correct?
21    A.  Yes.
22    Q.  And do you remember the details about
23 that, why they indicated that dismissal at that
24 time was what they were doing?
25    A.  No, I don't.

**Page 53**

1    Q.  And it was someone named Mr. Smith, does
2 that name ring a bell?
3    A.  No.
4    Q.  Kind of a mystery name there.  Mr.
5 Thornberry is smiling at me like I'm making it up.
6    A.  No, I don't.
7    Q.  You don't recall the person who signed the
8 dismissal letter?
9    A.  No, I don't.
10    Q.  Okay.  And what happened was, it indicates
11 there that you served a suspension from June 2nd,
12 2009 until May 19th of 2010, correct?
13    A.  That's correct.
14    Q.  Almost a year?
15    A.  Yes.
16    Q.  And you were out of work during that
17 period of time, correct?
18    A.  That's correct.
19    Q.  But you were reinstated, right?
20    A.  Yes.
21    Q.  And do you remember signing something
22 called a Last Chance Agreement?
23    A.  I don't, I don't remember.
24    Q.  Okay.  Do you remember being informed you
25 were being reinstated on what's referred to as a

14 (Pages 50 - 53)

1 Last Chance basis?
2 A. No, I don't.
3 Q. But you didn't get any back pay, correct?
4 A. No, I didn't get any.
5 Q. And do you know why you were reinstated?
6 A. No.
7 Q. Was it the result of an arbitration award?
8 A. I don't recall.
9 Q. Okay. But they gave you a level S, actual
10 suspension, and another one of these 36-month
11 review or probationary periods, correct?
12 A. That's correct.
13 Q. Let's go through a couple more of these
14 and then we'll take a break. Do you remember
15 working with someone at BNSF in 2011 named Brandon
16 Ogden?
17 A. That name sounds familiar, but I don't...
18 Q. Do you remember getting a letter from Mr.
19 Ogden in July of 2011 during a time that you were
20 taking some intermittent FMLA leave?
21 A. I don't recall.
22 Q. Okay. Do you remember a letter from him
23 saying that you were laying off of on FMLA in
24 excess of the amount that you had been allotted?
25 A. I, I don't remember.

1 Q. Okay. The next entry on this there in
2 terms of discipline is November 1st, 2011 and it
3 indicates a formal reprimand, failure to protect
4 assignment and missed call at 00:01 on October
5 11th, 2011 when being called for assignment as crew
6 member on train, and there's a train number there,
7 do you recall this incident?
8 A. No, I don't.
9 Q. The language would suggest that this was a
10 situation where you were on some sort of call and
11 they called you and you missed the call, that's
12 what it says at least, right?
13 A. That's correct.
14 Q. And you got a formal reprimand for that,
15 correct?
16 A. Yes.
17 Q. And there's a, that waiver word is there
18 again, is that a situation, as you recall it, where
19 you did not go through the investigation, you just
20 signed a waiver accepting the discipline?
21 A. That's correct.
22 Q. Okay. And then I want to ask you about
23 this January 2012 entry. Again under the letter,
24 it says S, there's an S for serious violation,
25 correct?

1 A. Yes.
2 Q. And this would still be in the 36-month
3 probationary period for your suspension back from
4 June 2009 to May 2010, right?
5 A. That's correct.
6 Q. And it indicates in there that they're
7 giving you a 30-day record suspension for
8 negligence and indifference to duty by failure to
9 comply with instructions concerning loaded steel
10 movement restriction, do you recall what happened
11 in that situation?
12 A. I believe at the time they came out with a
13 new rule which is you have to have so many loaded
14 steels in your consist and the conductor verified
15 it and I guess he didn't understand the new rule
16 and by the time we got to our destination, we were
17 in violation.
18 Q. And, I sort of understood that, but not
19 completely and I'm not being facetious, I just want
20 to understand what happened. There were certain,
21 there was a rule governing the way that you loaded
22 certain materials?
23 A. They were already loaded, but there's
24 loads of steel that you can have behind the
25 locomotives in your train, and I think we were over

1 tonnage or had so many cars, I think you're only
2 allowed five at the time, I believe, and he, the
3 conductor didn't understand that rule.
4 Q. All right. But this would indicate that
5 you accepted that penalty by signing a waiver,
6 right?
7 A. That's correct.
8 Q. And then the next entry on there is March
9 14th of 2012, and there's another formal reprimand
10 there for violating the attendance guidelines for a
11 three-month period and you signed a waiver on that
12 as well, correct?
13 A. That's correct.
14 Q. All right. I'm going to shift into
15 another area in a minute, so why don't we take a
16 little break.
17 (Recess)
18 (Defendant's Exhibit 8 marked for
19 identification)
20 Q. (By Mr. Vogel) We're back on the record
21 after a break, I only say this once, you understand
22 when we take breaks, you come back and you're still
23 under oath, right?
24 A. That's correct.
25 Q. Let me hand you what's been marked as

Page 58

1 Deposition Exhibit 8, which is marked for
2 production, I think it's D-1225, it kind of gets
3 cut off there, but that is a letter to you from
4 July of 2011 by someone named Brandon Ogden,
5 correct?
6     A.   That's correct.
7     Q.   And up in the heading, it indicates that
8 Mr. Ogden was the Director of Administration for
9 the Springfield division, correct?
10    A.   That's correct.
11    Q.   Just to kind of draw a big picture hear,
12 even though you always worked in the Kansas City
13 area with BNSF, you would report to certain
14 divisions, right?
15    A.   That's correct.
16    Q.   And sometimes that division was a decent
17 distance away from where your worked, right?
18    A.   That's correct.
19    Q.   Sometimes you reported to Springfield,
20 Missouri like in here?
21    A.   No, my home terminal was considered Kansas
22 City, but I would work on their division, which
23 would be considered Springfield.
24    Q.   Got you.  And then sometimes at one point,
25 I think we'll get into it, you were considered to

Page 59

1 be in a Nebraska division, is that right?
2     A.   Yes.
3     Q.   But in any event, this letter from Mr.
4 Ogden, again I think I asked you earlier if you
5 remembered it and you did not, that's fine, but it
6 indicates this is a time where you had been granted
7 FMLA for a family member's medical condition and
8 that medical certification had been provided to
9 qualify you for the FMLA leave, but I want to ask
10 you about that second paragraph.  It says "Mr.
11 Oropeza, your approved FMLA allows you to lay off
12 work one absence per week for appointments only.
13 You laid of FMLA more than one day per week in both
14 May and June if 2011 which exceeded your
15 allotment", that's what it says there, right?
16    A.   Yes.
17    Q.   And I think you've told me that you did
18 remember getting a similar letter along those lines
19 from a Mr. Jenkins back in the 2007 time frame,
20 correct?
21    A.   I believe so.
22    Q.   And one of the things it says in this
23 letter is that "if your medical condition has
24 changed, you must update your FMLA by providing an
25 updated health certification, a copy of form

Page 60

1 enclosed", so the HR Benefits Processing Team had
2 indicated on the application "if your medical
3 condition has not changed, you must comply with
4 your approved FMLA restrictions or you may be
5 subject to disciplinary action", that's what the
6 letter said, correct?
7     A.   That's correct.
8     Q.   So by the late summer of 2011, you had
9 gotten a couple of letters, understandably over a
10 multi-year period of time, indicating that BNSF
11 observed what they said was a difference between
12 the amount of FMLA you had been allotted by a
13 healthcare provider and the amount that you were
14 taking, correct?
15    A.   Yes.
16    Q.   And they told you you either needed to
17 comply with the allotment provided by the
18 healthcare provider or get an updated certification
19 presumably giving you a greater allotment, am I
20 saying that right?
21    A.   Yes.
22    Q.   Okay.
23         (Defendant's Exhibit 9 marked for
24             identification)
25    Q.   (By Mr. Vogel)  I'm going to hand you

Page 61

1 what's been marked as Exhibit 9, which is a
2 multi-page document D-101 to 105, and that is a
3 Certification of Healthcare Provider form that BNSF
4 provided its employees who wanted to get leave
5 certified under the FMLA, correct?
6     A.   That's correct.
7     Q.   And we sort of talked about this form
8 before, right?
9     A.   Yes.
10    Q.   And this is the form that would get
11 completed by the healthcare provider's office and
12 as you understood it, faxed directly to the HR
13 Benefits Processing Team for BNSF which is in Fort
14 Worth, Texas, correct?
15    A.   That's correct.
16    Q.   And to help us with any potential
17 confusion down the road, do you also go by Fred?
18    A.   No, they spelled my name wrong, when they
19 faxed it, I brought that to their attention, I said
20 "my name's not Fred".
21    Q.   I was a little confused by it because they
22 actually do it on a couple of these forms, if
23 you've seen that before.
24    A.   Yes.
25    Q.   So, and that's also why I asked you if you

16 (Pages 58 - 61)

1 have siblings here because I want to make sure I
2 wasn't missing anything. To the extent any of
3 these forms -- well, your mother's name is Carol,
4 correct?
5     A.  That's correct.
6     Q.  So any of the forms for Carol Oropeza,
7 from Carol Oropeza's healthcare providers
8 referencing a BNSF employee that might say Fred,
9 that is a reference to you, Frank, and they've just
10 made some sort of transcription error there, right?
11    A.  That's correct.
12    Q.  No one ever denied you the leave on that
13 basis, right, they never said "this is for Fred,
14 not Frank", right?
15    A.  That's right.
16    Q.  So as we understand it, with the exception
17 of the signature page there at the end, that's you
18 signing it, right, on May 23rd, 2012, on the very
19 last page?
20    A.  Yes.
21    Q.  Okay.  Other than that, is it your
22 understanding that this document, the handwriting
23 in this form is completed either by your mother's
24 healthcare provider or someone who works with his
25 office?

1     A.  That's correct.
2     Q.  And that the provider who fills out, I
3 think, all of the forms that we're going to be
4 looking at, really all of the forms from 2012
5 forward, is a gentleman named Richard Dubinsky,
6 correct?  D-U-B-I-N-S-K-Y.  And he is a
7 neurologist, is that right?
8     A.  Yes.
9     Q.  Now, just to draw a little framework, and
10 I'm not going to go real deep into it, but the
11 serious health condition that your mother has that
12 you asked for time off related to what is called
13 dystonia, D-Y-S-T-O-N-I-A, is that correct?
14    A.  That's correct.
15    Q.  Just in a general sense, can you just
16 explain to us in lay persons terms how you
17 understand that that impairment limits her?
18    A.  It's a rare nerve disorder which causes
19 irregular movements of your body parts similar to
20 Parkinson's, but not so severe.
21    Q.  Okay.  And she's had that since somewhere
22 in the 2008 time frame or thereabouts?
23    A.  They believe so.
24    Q.  Okay.  And this form has various boxes and
25 sections to be filled out, but if you get to the

1 next to last page, there's a box there that says
2 "employee time away from work", do you see that?
3     A.  Yes.
4     Q.  And it says, and I guess that's section 9
5 because all the questions have a 9, right?
6     A.  Yes.
7     Q.  And a 9-A says "will it be necessary for
8 our BNSF employee to be absent from work due to the
9 patient's treatment", and the box is checked as
10 "yes", correct?
11    A.  That's correct.
12    Q.  Now under 9-D, it says "continuous
13 absence, if all or a portion of the absence will be
14 continuous, please provide" and there's beginning
15 date and estimated end date, right?
16    A.  Yes.
17    Q.  And it says under beginning date September
18 2011 and estimated end date, it says
19 "indefinitely", correct?
20    A.  Yes.
21    Q.  But were you ever asking BNSF to give you
22 a continuous absence, like, in this context from
23 September of 2011 going forward where you would
24 just be out of work for a block period of time?
25    A.  I don't recall.

1     Q.  Okay.  But under 9-C, it says
2 "intermittent absence", "if absence is
3 intermittent, will it be necessary for our BNSF
4 employee to be away from work occasionally
5 (intermittently) or to work less than full
6 schedule" and the answer there is "yes", correct?
7     A.  Yes.
8     Q.  And it says "if yes, please provide the
9 approximate frequency of absences our employee will
10 need", it says, "for example, three absences per
11 month", is there as an example in parentheses,
12 correct?
13    A.  Yes.
14    Q.  What is written in there is a number 1
15 with a circle and it says "per week", and then off
16 to the side someone has written "4/MTH max", which
17 I think we can agree is a shorthand for four per
18 month maximum, correct?
19    A.  That's correct.
20    Q.  And then it says "will absence be
21 necessary on weekends", and they've checked the box
22 that says "no", correct?
23    A.  That's correct.
24    Q.  And then it says "if intermittent leave
25 under 9-E, please provide the approximate duration

1 of each absence the employee will need" and the box
2 that's checked is "three to four days", correct?
3    A.  That's correct.
4    Q.  And you signed this document on the last
5 page, is this something that you see before you
6 sign it?
7    A.  Yes.
8    Q.  Okay.  Do you keep a copy of it?
9    A.  Yes.
10    Q.  And if I'm looking at this fax line
11 correctly -- well, let's get the dates right, it
12 looks like it was signed by Dr. Dubinsky and you on
13 May 23rd, 2012, correct?
14    A.  That's correct.
15    Q.  And then looking at the fax line, it looks
16 like it was faxed on June 1st, 2012, correct?
17    A.  That's correct.
18       (Defendant's Exhibit 10 marked for
19          identification)
20    Q.  (By Mr. Vogel)  I'm going to hand you
21 what's been marked as Exhibit 10, which is a
22 three-page document marked for production D-98 to
23 D-100, and we talked earlier about under the
24 policy, employees would receive some sort of
25 written notification from the HR Benefits

1 Processing Team telling them whether they were
2 being granted or denied leave, correct?
3    A.  That's correct.
4    Q.  And this is a copy with some crazy lines
5 on it, so sorry about that, but can you still read
6 that okay?
7    A.  Yes.
8    Q.  Okay.  And this is a letter dated June
9 5th, 2012 to you regarding approval and designation
10 of FMLA leave and a parenthetical indicating it's
11 to care for your mother, correct?
12    A.  That's correct.
13    Q.  Okay.  And do you remember getting this
14 letter?
15    A.  Yes.
16    Q.  And you got a variety of these letters
17 over the years, right?
18    A.  That's correct.
19    Q.  And they'd say "approved" and how much if
20 the leave had been approved, right?
21    A.  That's correct.
22    Q.  And you got some over the years that,
23 because of time you had been out of work and things
24 like that, said "denied" because you didn't have
25 enough hours, do you remember that?

1    A.  That's correct.
2    Q.  Okay.  But this one indicates that they
3 had received the request on May 24th and that the
4 request for intermittent leave is approved and the
5 dates approved are May 24th, 2012 through May 23rd,
6 2013, correct?
7    A.  Yes.
8    Q.  About a one-year time period, right?
9    A.  That's correct.
10    Q.  They do say "note that you may be required
11 to obtain an updated Certification of Healthcare
12 Provider form from your provider within six months
13 of your approval date or earlier as permitted by
14 the FMLA regulations if so notified in writing.
15 All leave taken for this reason will be designated
16 as FMLA leave", and that's just sort of summarizing
17 the fact that, although they are giving it to you
18 for a year, they're telling you that within six
19 months or maybe at other times, they can write to
20 you and say "we want you to get an updated
21 certification form", correct?
22    A.  That's correct.
23    Q.  And then in bold letters there, in the
24 bold language there in the third paragraph, it
25 states "the healthcare provider indicated you may

1 need one absence per week, duration one day per
2 absence, weekend days unlikely".  That's what they
3 said, correct?
4    A.  That's correct.
5    Q.  And then a couple of paragraphs down, it
6 says "the FMLA requires that you notify BNSF as
7 soon as practicable if dates of scheduled leave
8 change or are extended or were initially unknown.
9 After your leave begins, you have the right to
10 request information regarding your FMLA leave
11 balance once every 30 days.  Please direct any such
12 request to the HR Benefits Processing Team", do you
13 remember with regard to this particular leave,
14 after you got this letter on June 5th, 2012, and I
15 know we're going back almost five years, but do you
16 remember whether you reached out to the HR Benefits
17 Processing Team at all with regard to this response
18 to your Request For Leave?
19    A.  I, I don't recall.
20    Q.  And the reason I ask that is because it
21 indicates "one absence per week, weekend days
22 unlikely", which matches up with the certification
23 form, but at least on the one, sometimes it's hard
24 to get which form was for which FMLA leave, but it
25 looks like the June 5th letter would be a response

18 (Pages 66 - 69)

Case 4:16-cv-01013-GAF   Document 131-1  Filed 06/16/17  Page 18 of 39
Veritext Legal Solutions
800-567-8658                                  973-410-4040

Page 70

to the form that was signed on May 23rd, 2012, would that make sense?
A. Yes.
Q. Okay. And on the one on May 23rd, 2012, the doctor's office actually checked that each absence could be three to four days, do you see that?
A. Yes.
Q. So I guess what I'm asking, I'm not being argumentative with you, I'm just curious if it refreshes your recollection at all because you said that you kept a copy of the certification forms, right?
A. That's correct.
Q. Did you reach out to the Benefits Processing Team and say something to the effect of "you've approved me for these absences of one day duration, but my form actually says three to four days for duration"?
A. I kind of recall contacting them and asking them that, or trying to get an explanation of it.
Q. Okay. You think did you that verbally?
A. Yeah, I called that 1-800 number on the packet.

Page 71

Q. Okay. And do you remember anything about who you talked to or what the conversation was?
A. I don't remember any names.
Q. Okay. By the way, can we jump back to the Employee Transcript for just a second, there's one I left out -- oh, no, I beg your pardon, forget it, I'm sorry.
(Defendant's Exhibit 11 marked for identification)
Q. (By Mr. Vogel) Let me hand you what's been marked as Exhibit 11 to your deposition, which is a one-page document numbered for production D-97. Let me ask you; have you ever seen that document before?
A. Yes.
Q. And that is a letter to you dated September 24th, 2012 from someone named Greg Wright, W-R-I-G-H-T, correct?
A. That's correct.
Q. And Mr. Wright is identified as Director Administration for the Nebraska Division, correct?
A. That's correct.
Q. And at this time, that's kind of what we were talking about, you were considered part of the Nebraska Division just by being in Kansas City,

Page 72

right?
A. That's right.
Q. Okay. Have you ever met Mr. Wright?
A. No, I haven't.
Q. Have you ever spoken to him?
A. No.
Q. So he writes to you here and says "Mr. Oropeza, you have been granted family leave under Family Medical Leave Act 1993. Medical certification is required from your healthcare provider before you qualify for your FMLA leave. Medical information provided by your healthcare provider was personal and confidential and the medical condition underlying for FMLA is unknown to this office". And I think we touched on that earlier, but I want to be clear, are you aware of anything to suggest that the medical information that was provided by the healthcare provider was ever seen by Mr. Wright?
A. I, I don't recall.
Q. Okay. And it says "your medical provider did indicate you should have one absence per week with one day duration and unlikely weekend layoffs between May 24th, 2012 through May 23rd, 2013", and I don't have the attachment here, but it says "I am

Page 73

attaching a document listing the dates you have laid off FMLA. Records indicate you have taken more than the recommended absences. Between the months of July 11, 2012 and August 24th, 2012, you laid off FMLA 13 times with eight of these layoffs on the weekend. And between the months of July 28, 2012 and August 4th, 2012, you laid off two times. These layoffs exceed your allotment and your pattern of leave is inconsistent with physician recommended leave requirements". I'm going to go ahead and read the last paragraph into the record as well. "Given the nature of your FMLA usage, BNSF is monitoring the situation closely. If your medical condition has changed, you must bring up to date you're FMLA by providing an updated health certification, copy of form enclosed, and resubmit it to HR Benefits Processing Team as indicated on the application. If your medical condition has not changed, you must comply with your approved FMLA restrictions or you may be subject to disciplinary action". First off, let me ask, you don't dispute the number of layoffs, right, that you took during this period of time, do you?
A. No.
Q. Okay. And can you tell me why you would,

Page 74

1 I think the answer is obvious, but why would you
2 layoff FMLA 13 times between July 11th, 2012 and
3 August 24th, 2012 with eight on the weekends?
4    A.  Some of her sickness was kind of
5 unpredictable and at the same time, my work
6 schedule would fall on the weekend where her,
7 sometimes her medical appointments or she would
8 need medical attention would come on a Monday into
9 my work schedule.
10    Q.  I got you.  So if she had an appointment
11 on a Monday and you were assigned to work on the
12 weekend, the way your schedule would work, if you
13 took that assignment, you wouldn't be back on the
14 Monday to take her to the appointment, right?
15    A.  That's correct.  My work schedule was
16 unpredictable, so I didn't ever know when I was
17 going to work or what time.
18    Q.  So let's help some people who don't work
19 at BNSF, because in your role, because by this
20 time, you had been an engineer for some time,
21 right?
22    A.  Yes.
23    Q.  So in your role as engineer, why don't you
24 just do your best kind to explain to somebody
25 reading this down the road, including me who

Page 75

1 doesn't work at BNSF, kind of how that worked in
2 terms of your assignments and how it impacted your
3 need to call in to utilize your FMLA?
4    A.  From what I recall, I was an engineer,
5 worked on the road, which basically is a seven day,
6 24 hour process, you're on call seven days a week
7 for a 24 hour period and you can get called any
8 time throughout the day, and they have to give you
9 a two hour call before the on-duty date, I mean,
10 the on-duty time, I'm sorry, and the schedule was
11 just unpredictable on when, the dates and times of
12 when I would be going to work.
13    Q.  Okay.  So what did you do when you got
14 this letter from Mr. Wright basically saying you
15 were exceeding your FMLA allotted usage?
16    A.  I mentioned it to my local chairman.
17    Q.  Who was your local chairman at that time?
18    A.  Dan Holtcroft.
19    Q.  Okay.  And what did Mr. Holtcroft say?
20    A.  He just basically would bring it to the
21 management or superintendent, which I believe was
22 Joe Dickerson.
23    Q.  What was your understanding of what Mr.
24 Holtcroft brought to the attention of Mr.
25 Dickerson?

Page 76

1    A.  He was just trying to get information on
2 the, about the letter, I believe.
3    Q.  Were you present for those conversations?
4    A.  No.
5    Q.  So anything you know about those
6 conversations would have had to be told to you by
7 Mr. Holtcroft or Mr. Dickerson, right?
8    A.  That's correct.
9    Q.  After getting this letter, and we'll talk
10 about it at some later times too, but did you reach
11 out to Dr. Dubinsky's office and say something to
12 the effect of "there seems to be some confusion or
13 some disagreement between how much leave has been
14 given to me in the certification form versus what
15 my employer thinks I have and what I need to take",
16 that's a longwinded question, but do you know what
17 I'm asking you?
18    A.  Yes.
19    Q.  Okay.  Did you do that?
20    A.  Yes.
21    Q.  Did you get an updated certification form?
22    A.  I explained to him the situation I was in
23 and he kind of, he said "well, your mom's lifetime
24 sickness, it's unpredictable", he said "I put in
25 the days they asked, you know, if I leave anything

Page 77

1 blank, then they will deny and they have denied it
2 because there were certain boxes he left blank and
3 they wanted everything filled out as much as
4 possible.
5    Q.  Okay.
6    A.  And I believe it was under that 9-A
7 section is where he left some of it blank and he
8 had to refill it or put more information in there.
9    Q.  Okay.
10    A.  Is what he told me.
11    Q.  Anything else you remember about your
12 discussion with him?
13    A.  That's all I can recall.
14       (Defendant's Exhibit 12 marked for
15          identification)
16    Q.  (By Mr. Vogel)  Let me hand you what's
17 been marked as Exhibit 12 to your deposition, and
18 this is a document marked for production D-88 to
19 D-92, and this is a certification completed by
20 Dr. Dubinsky's office and if you look at Page D-91,
21 it looks like Dr. Dubinsky signed it on December
22 21st, 2012, correct?
23    A.  That's correct.
24    Q.  So this is, can we assume that this is a
25 situation where a little more than six months after

20 (Pages 74 - 77)

1 your leave started, someone asked you for an
2 updated certification, is that correct?
3    A. That's correct.
4    Q. Because this is kind of halfway through
5 that one-year period that you were given FMLA for,
6 right?
7    A. That's correct.
8    Q. Okay. So again he calls you Fred, but
9 other than that, we can understand that this is,
10 this involves you and the care you might need for
11 your mom, right?
12    A. That's correct.
13    Q. Okay. And if we go to Page D-91, under
14 "employee time away from work", again it goes to
15 the same issues, but under "intermittent absence",
16 it says "please provide the approximate frequency
17 of absences our employee will need" and it's
18 written there "four per year", right?
19    A. Yes.
20    Q. And it says "will absence be necessary on
21 weekends" and there's a "no", correct?
22    A. Yes.
23    Q. And it says "if intermittent leave, please
24 provide the approximation duration of each
25 absence", and this time the one day box is checked

1 -- oh, I'm sorry, well, it looks like it says "one
2 day", right?
3    A. Yes.
4    Q. Okay. And so this is what's faxed to the
5 HR Benefits Center, right?
6    A. That's correct.
7    Q. Benefits Processing Team, excuse me. But
8 again you get a copy of this, right?
9    A. Yes.
10    Q. And when you're reviewing it, and again I
11 know we're going back a few years, but by the time
12 this is completed, you've already gotten this
13 letter from Mr. Wright, correct?
14    A. Yes.
15    Q. The September 24th, 2012 one, correct?
16    A. That's correct.
17    Q. And he is saying in that letter that "if
18 you exceed the amount of FMLA time off that we
19 think you've been allotted, we might take
20 disciplinary action against you", correct?
21    A. Correct.
22    Q. Does that prompt you at all to go to
23 Dr. Dubinsky or someone in his office and explain
24 that the way the employee time away from work part
25 is written, that -- let me rephrase it. Do you

1 know at that time that you were probably going to
2 need more than four absence per year to take care
3 of your mom?
4    A. Yes.
5    Q. Do you know that sometimes those absences
6 are going to end up lasting more than a day?
7    A. Yes.
8    Q. They're going to last more than a day
9 because either you need to take care of her for
10 more than a day, that could be one possibility,
11 right?
12    A. Yes.
13    Q. And it also could impact your ability to
14 accept a call as an engineer that would take you
15 away for several days, right?
16    A. Correct.
17    Q. And you know then that there's certainly
18 the possibility that this could require you to use
19 FMLA leave and be absent on weekends, correct?
20    A. Correct.
21    Q. When otherwise you would be scheduled to
22 work, right?
23    A. Correct.
24    Q. Did you talk to Dr. Dubinsky about in this
25 time frame?

1    A. Yes.
2    Q. And tell me what you said to him -- did
3 you talk directly to him when you talked to him?
4 Did he give you a time or does he shuffle you to
5 somebody else?
6    A. There's been times where I've talked to
7 him on the phone.
8    Q. About this particular issue?
9    A. Yes.
10    Q. Tell me in this, if you can, and I know
11 it's probably tough, but in this December 2012 time
12 frame, what did you say to him and what he says to
13 you with regard to this allotment?
14    A. I just brought it to his attention on the
15 days he recommended or put down on my application
16 and explained to him that basically I could get
17 disciplined for, if I exceeded the amount of days,
18 and he put on there, you know, "well, I put
19 indefinitely so", and I understood where he meant
20 "indefinitely" that my mom would be sick "and you
21 would probably have to use it, but when I put four
22 down, basically that was four doctors appointments
23 because my office is only opened Monday through
24 Friday and I won't need to see her on the weekend,
25 but you would have to take care of her probably on

Page 82

1  the weekends", he said "I tried to explain that to
2  him", he goes "I don't know when your mom's going
3  to get sick, it's unpredictable, that's why I put
4  indefinitely" and that's what he told me.
5      Q.  Okay.  But do you realize at this point
6  there's, that this is creating a problem for you?
7      A.  Yes.
8      Q.  You realize at least that there is a --
9  well, let me go to the next exhibit.
10         (Defendant's Exhibit 13 marked for
11             identification)
12     Q.  (By Mr. Vogel)  So let me hand you what's
13  been marked as Exhibit 13, which is a document
14  marked for production D-85 to D-87, that's a letter
15  to you dated December 27, 2012, from the HR
16  Benefits Processing Team, right?
17     A.  Correct.
18     Q.  And this is, this is in response to what
19  we've just been discussing as Exhibit 12, right?
20  We can assume that this letter is responding to the
21  December 21st, 2012 certification, correct?
22     A.  Correct.
23     Q.  And they write in here on December 21st,
24  2012 "we received a current Certification of
25  Healthcare Provider regarding your FMLA approval as

Page 83

1  requested.  Your approval will remain in place
2  through May 23rd, 2013.  The provider has indicated
3  that you may need four absences per year duration
4  one day, unlikely weekend absence".  That's what
5  they wrote to you, correct?
6      A.  Correct.
7      Q.  And again, you understand when you get
8  this letter that you believe you're going to need
9  significantly more time than that, right, or at
10  least some more time than that, right?
11     A.  Correct.
12     Q.  Okay.  So do you contact the HR Benefits
13  Processing Center and say "this is wrong, I need
14  more time than this"?
15     A.  I have contacted the Processing Team and
16  tried to explain to them what my doctor has told me
17  when I've brought this up to his attention, and
18  they basically just didn't do anything.
19     Q.  Okay.  But do you understand one kind of
20  leave you can ask for under FMLA is a continuous
21  leave, do you understand that?
22     A.  Yes.
23     Q.  So for example, and it could apply to you
24  as a father, when an employee has a baby, either
25  the woman gives birth or the husband's partner has

Page 84

1  a baby, you can take a continuous period of time
2  off, right?
3      A.  Yes.
4      Q.  And so you can indicate that that's what
5  you're asking for, correct?
6      A.  I was asking for intermittent.
7      Q.  Okay.  You were not asking for a
8  continuous period of time off?
9      A.  No.
10     Q.  All right.  Do you remember specifically
11  in response to this December 27, 2012 letter any
12  conversation you had with the HR Benefits
13  Processing Team about it?
14     A.  No, I don't recall.
15     Q.  Did you ever respond to these, I'm going
16  to call these allotments, that they gave you, is
17  that fair?
18     A.  Yes.
19     Q.  Did you ever respond to these allotments
20  that they gave you in here in writing?
21     A.  No.
22     Q.  Okay.  So we don't have, at least you
23  don't have any documentation to say "I got this
24  letter, I reached out to the HR Benefits Processing
25  Team, here's what I said, here's what they said",

Page 85

1  we don't have any of that documented, right?
2      A.  No.
3      Q.  Okay.  If we look back at the Employee
4  Transcript, you did not receive any discipline
5  between May of 2012 and May of 2013, which is the
6  period in which you were granted FMLA based on
7  these series of documents that we just looked at,
8  right?
9      A.  Correct.
10         (Defendant's Exhibit 14 marked for
11             identification)
12     Q.  (By Mr. Vogel)  I'm going to hand you
13  what's been marked as Exhibit 14, a little cleaner
14  copy there, which is a document number for
15  production D-4 to D-8, and this is another
16  healthcare provider certification form completed by
17  Dr. Dubinsky regarding your care for your mom,
18  right?
19     A.  That's correct.
20     Q.  And it looks like you signed this one on
21  the last page on June 10th, 2013?
22     A.  Yes.
23     Q.  It looks like they, somebody sort of
24  corrected themselves here because they wrote
25  "Fred", but they put it in quotes and wrote Frank

22 (Pages 82 - 85)

Exhibit A

Page 86

1  off to the side, so they must have heard you this
2  time when you said "that's not my name", right?
3  A.  Yes.
4  Q.  Okay.  So again there's some information
5  throughout this document, but under "employee time
6  away from work", under "intermittent absence" on
7  9-C, which is what you were asking for, correct?
8  A.  That's correct.
9  Q.  It says "frequency of absences", it says
10 "one absence per three months", does that mean one
11 absence every three months --
12 A.  Yes.
13 Q.  -- to you?
14 A.  Yes.
15 Q.  And again, it says "will absence be
16 necessary on weekend", the box checked is "no", and
17 then under "the approximate duration of each
18 absence", it says "one day", correct?
19 A.  Correct.
20 Q.  Okay.
21     (Defendant's Exhibit 15 marked for
22         identification)
23 Q.  (By Mr. Vogel)  Let me hand you what's
24 been marked as Exhibit 15 -- by the way, on Exhibit
25 14, it says at the top, there's a fax line there on

Page 87

1  September 11th, correct?
2  A.  Yes.
3  Q.  So then when we jump to Number 15, it's a
4  letter to you from the HR Benefits Processing Team
5  dated September 17, 2013, correct?
6  A.  Correct.
7  Q.  And this indicates that on September 11th
8  they received your request for intermittent leave,
9  so that's probably in reference to the
10 certification we just looked at, correct?
11 A.  That's correct.
12 Q.  Okay.  This is letters numbered for
13 production D-1 to D-2, do you remember getting this
14 letter?
15 A.  Yes.
16 Q.  Okay.  So on here, they say "on 9/11/2013,
17 we received your request for intermittent leave
18 under the FMLA", and it goes on to say "request for
19 intermittent leave is approved from September 11th,
20 2013 through September 10th, 2014", right?
21 A.  Correct.
22 Q.  Now, the last letter we looked at, and I'm
23 not trying to trick you, I think I gave the whole
24 sequence that we had, so during, the last series of
25 things that we looked at, that leave period ended

Page 88

1  in May of 2013, correct?
2  A.  Yes.
3  Q.  And then this one picks up in September of
4  2013, correct?
5  A.  That's correct.
6  Q.  Do you know, as we're sitting here now,
7  whether you were approved for leave at all between
8  May 23rd, 2013 and September 11th, 2013?
9  A.  I don't, I don't recall.
10 Q.  Okay.  Because if you look back at the
11 Employee Transcript, sorry, I just want to get one
12 other thing straightened out, if you look on Page 3
13 of that, there's an entry on there on September
14 18th, 2013, do you see that?
15 A.  Yes.
16 Q.  And you received a formal reprimand for
17 violating the attendance guidelines for being
18 absent in excess of the guidelines for June, July
19 and August of 2013, do you see that?
20 A.  Yes.
21 Q.  And as we sit here today, you can't tell
22 me for sure whether you were approved for FMLA
23 during that window of time, right?
24 A.  I don't, you know, I don't recall.
25 Q.  There would have to be, if we find a

Page 89

1  certification or a letter or something like that,
2  that would demonstrate whether you were approved or
3  not, right?
4  A.  Correct.
5  Q.  Okay.  And assuming with me for a minute
6  if you were not approved for FMLA during that time
7  frame, then any sort of discipline for absences
8  during that time frame would not have been for
9  absences taken as FMLA?
10 A.  Correct.
11 Q.  And you signed a waiver on this one,
12 correct?
13 A.  Yes.
14 Q.  And this formal reprimand actually says it
15 has a 12-month review period, do you see that?
16 A.  Yes.
17 Q.  All right.  So, and I'm sorry I'm jumping
18 around there.  On Exhibit 15, the September 17th,
19 2013 letter to you approving you for intermittent
20 leave from 9/11/2013 through 9/10/2014, it has that
21 same language in there about under some
22 circumstances, they can ask you for a
23 recertification, correct?
24 A.  Correct.
25 Q.  And then in bold letters, the last

23 (Pages 86 - 89)

Case 4:16-cv-01013-GAF   Document 31-1  Filed 06/16/17   Page 23 of 39
800-567-8658                                    973-410-4040

1 sentence of the second paragraph in the letter says
2 "the healthcare provider is stating you may need
3 four absences per year, duration one day, unlikely
4 weekend absence", correct?
5    A.   Correct.
6    Q.   And from your history of going through
7 this, you believed you were going to need more
8 leave, correct?
9    A.   Correct.
10    Q.   And it says "the FMLA requires", and I'm
11 reading from the next paragraph, "that you notify
12 BNSF as soon as practicable if dates of scheduled
13 leave change or are extended or were initially
14 unknown".  What did you do when you got this letter
15 in terms of contacting the HR Benefits Processing
16 Team with regard to what they had written regarding
17 the need for leave?
18    A.   I just contacted the HR Processing Team
19 and just kind of asked for an explanation on why it
20 was just four days.
21    Q.   Do you remember who you talked to?
22    A.   No, I don't.
23    Q.   Do you remember what they said?
24    A.   They basically just told me they'd look
25 into it and get in contact with me.

1    Q.   Okay.  Did you go back to Dr. Dubinsky
2 after you got this letter and explain that what he
3 had been put down for intermittent absence was less
4 than you believed you would need?
5    A.   Yes, he basically gave me the same answer,
6 just at those, those intermittent leaves was, I was
7 referring to as doctors appointments and four days
8 would be like Monday through Friday, and that's
9 when his offices were open, and he goes "if I left
10 it blank, they would deny it" and that's what they
11 told him.
12    Q.   Okay.  And I know there's some language
13 indicating that leaving the form blank, it may well
14 be denied, but did you have a more detailed
15 conversation with him about expanding the number of
16 intermittent absences that were going to be needed
17 if you knew you were going to need more than that?
18    A.   I brought it to his attention and I don't,
19 I don't recall what happened after that, if
20 anything was done.
21        (Defendant's Exhibit 16 marked for
22            identification)
23    Q.   (By Mr. Vogel)  Let me hand you what's
24 been marked as Exhibit 16, which is a one-page
25 document marked for production D-14 and that's

1 another letter to you from Mr. Wright, correct?
2    A.   Correct.
3    Q.   And this one comes in November of 2013,
4 which is about two months after your most recent
5 period for leave has been approved, correct?
6    A.   Correct.
7    Q.   And this letter is very similar to letters
8 you had received in the past including one from Mr.
9 Wright back in September of 2012, correct?
10    A.   Correct.
11    Q.   And it's similar to the letter you
12 received from Mr. Ogden back in July of 2011,
13 correct?
14    A.   Correct.
15    Q.   And it's similar to a letter you received
16 from Mr. Jenkins back in November of 2007, correct?
17    A.   Correct.
18    Q.   Okay.  And what they're saying in this
19 letter is that you had been granted FMLA, and that
20 the approved FMLA allows you to lay off four
21 absences per year.  This one actually says "with
22 the duration of one to two days per layoff and
23 unlikely weekend layoffs", that's what he wrote
24 here, correct?
25    A.   Correct.

1    Q.   And it indicates "records indicate you
2 have taken more than the recommended absences.  You
3 have laid off FMLA a total of seven times in 2013,
4 including four weekend layoffs.  These layoffs
5 exceed your allotment and your pattern of leave is
6 inconsistent with physician recommended leave
7 requirements".  And you don't dispute that you had
8 laid off more than four times so far in the year,
9 right?
10    A.   No.
11    Q.   I said "right" and you said "no", that was
12 bad on my part.  Is that accurate?
13    A.   Yes.
14    Q.   So just kind of as a big picture thing,
15 we're not really arguing in this case about how
16 many days you took off or whether you designated
17 those days as FMLA, right?
18    A.   Correct.
19    Q.   Okay.  And then the last paragraph, as
20 we've read similar language before, "given the
21 nature of your FMLA usage, BNSF is monitoring the
22 situation closely.  If your medical condition has
23 changed, you must bring up to date your FMLA by
24 providing an updated Health Certification, copy of
25 form enclosed, and resubmit to HR Benefits

Processing Team as indicated on the application.

Exhibit A

1 Processing Team as indicated on the application.
2 If your medical condition has not changed, you must
3 comply with your approved FMLA restrictions or you
4 may be subject to disciplinary action". I read
5 that correctly?
6 A. Yes.
7 Q. What did you do when you got this letter?
8 A. I just brought it, or brought it to my
9 local chairman's attention.
10 Q. Same guy, right?
11 A. Yes, Dan Holtcroft.
12 Q. Thank you for helping me, I've seen the
13 name a bunch of times. Tell me about your
14 conversation with Mr. Holtcroft. Was it by phone
15 or in person?
16 A. I believe it was by phone.
17 Q. Okay. What did you say and what did he
18 say?
19 A. I just basically explained to him, you
20 know, the situation I was in with my mother and
21 this letter I received.
22 Q. What did he say?
23 A. He would look into it and get in contact
24 with the, I believe the superintendent, Joe
25 Dickerson, and I think it was Greg Wright, I don't,

1 I don't recall what else he said.
2 Q. Okay. Do you know if he did that?
3 A. I think he talked to Joe Dickerson and I
4 don't recall what the information he gave my local
5 chairman.
6 Q. So Mr. Holtcroft indicated to you that he
7 talked to Mr. Dickerson, you believe, right?
8 A. Yes.
9 Q. And you don't recall what he conveyed to
10 you about that conversation?
11 A. No, it was just basically just, they, they
12 would look into it and probably suggest that I
13 bring, send in a new certification packet if I
14 needed to.
15 Q. Okay. Did you send in a new certification
16 packet?
17 A. I think I contacted the HR Processing team
18 and tried to explain to them and they basically
19 told me I didn't need to send in the
20 re-certification packet because it was still a
21 legit, was what they told me. And they said "well,
22 did anything health change" and I said "no", I said
23 "the sickness she has is long-lasting, it won't go
24 away or change", and basically I explained to him I
25 didn't know what else to do, if they were wanting

1 me to update my medical, or I mean, my
2 certification and she just basically told me that
3 who, she's asking me who's referring you or
4 requesting this and I said "well, my supervisor".
5 Q. Okay. And I think maybe later you
6 indicated you do remember who you talked to then,
7 do you remember the person's name who you talked to
8 then?
9 A. At the processing team?
10 Q. Yes.
11 A. It was, it was, it changed every time I
12 talked to someone, when I called that number, it
13 was a lady, I don't.
14 Q. Did you explain to whoever you talked to
15 that you had received this letter from Mr. Wright?
16 A. Yes.
17 Q. And did you explain that the letter was
18 indicating that you were exceeding the number of
19 absences that you had been allotted pursuant to the
20 certification?
21 A. Yes.
22 Q. And your testimony is that whoever this
23 person was who you talked to indicated that you
24 didn't have to do anything?
25 A. They, from my understanding, they

1 basically said I didn't have to re-certify because
2 it was still on file and it was still, it wasn't
3 expired. The only time that I would have to
4 re-certify it is if the medical conditions changed
5 and it never changed.
6 Q. But you knew that your leadership team was
7 telling you that you were taking more time off
8 than, at least according to the letter, that they
9 understood you were allowed, right?
10 A. Correct.
11 Q. Okay. Did you explain that to the HR
12 Benefits Processing Team?
13 A. I don't recall.
14 Q. Okay. Mr. Wright's phone number is on
15 this letter, correct?
16 A. Correct.
17 Q. Did you ever pick up the phone and call
18 him?
19 A. I don't, I don't believe I have.
20 Q. Why not?
21 A. I don't know.
22 Q. Okay. Did you go, after November 14th,
23 2013, and if I asked you this already, I'm sorry,
24 I'm going through all these letters, did you reach
25 out to Dr. Dubinsky's office specifically after

25 (Pages 94 - 97)

800-567-8658                                                973-410-4040

Exhibit A

Page 98

1 receiving this November 2013 letter?
2    A.  I don't recall.
3    Q.  Okay.  And just to see how sort of this,
4 the leadership team worked in your particular role,
5 Mr. Dickerson, did you actually interact with Mr.
6 Dickerson?
7    A.  No.
8    Q.  Okay.  Was Mr. Dickerson also stationed in
9 Nebraska?
10    A.  He was stationed at, in North Kansas City,
11 it was the Murray yard.
12    Q.  Did you ever meet him?
13    A.  Yes.
14    Q.  Did you ever talk to him?
15    A.  Yes.
16    Q.  Did you ever talk to him about your
17 attendance situation?
18    A.  I don't recall.
19    Q.  Or just to be sure I asked specifically,
20 did you ever talk to him about your FMLA situation?
21    A.  No, I don't recall.
22    Q.  How about Mr. Tylick, was he in the Kansas
23 City area?
24    A.  Yes, he's at the same location as Mr.
25 Dickerson.

Page 99

1    Q.  Did you meet him?
2    A.  Yes.
3    Q.  Did you have conversations with him?
4    A.  Not really.
5    Q.  Okay.  Did you -- so you didn't have any
6 conversation with him about your attendance?
7    A.  No, not that I recall.
8    Q.  Did you have any conversation with him
9 about your FMLA?
10    A.  No.
11    Q.  How about Darren Compton, was he in the
12 Kansas City area?
13    A.  I believe he was in Nebraska, I don't know
14 which location.
15    Q.  Did you ever meet him?
16    A.  Yes.
17    Q.  In person?
18    A.  Yes.
19    Q.  Okay.  Did you ever speak with him?
20    A.  Yes.
21    Q.  Did you ever speak with him about
22 attendance issues?
23    A.  No.
24    Q.  Did you ever speak with him about your FMLA?
25    A.  No.

Page 100

1    Q.  The next entry on your disciplinary record
2 on the Employee Transcript is still on Page 3
3 there, it's April 14th of 2014, do you see that?
4    A.  Yes.
5    Q.  And it indicates that "you are receiving a
6 10-day record suspension for violating the BNSF
7 attendance guidelines during December 2013 and
8 January and February of 2014", correct?
9    A.  Correct.
10    Q.  Now, this was a time period in which you
11 had been approved for FMLA leave, correct?
12    A.  Correct.
13    Q.  Do you recall whether any of the missed
14 days that were considered in determining that you
15 violated the attendance guidelines were days that
16 you had laid off for FMLA?
17    A.  Yes, I don't recall.
18    Q.  Okay.  This also indicates that you took a
19 waiver on that record suspension, correct?
20    A.  Yes.
21    Q.  And got a 12-month review period, right?
22    A.  Correct.
23    Q.  And again, just to reiterate, with all
24 those situations, you could have taken it to an
25 investigation, correct?

Page 101

1    A.  Correct.
2    Q.  Do you remember why you chose not to and
3 why you took the waiver?
4    A.  I don't recall.
5    Q.  Okay.  Let's take a break.
6          (Recess)
7       (Defendant's Exhibit 17 marked for
8          identification)
9    Q.  (By Mr. Vogel)  I'm going to hand you a
10 larger document, it's been marked as Exhibit 17 to
11 your deposition, it's numbered for production 199
12 to 255 and I'll represent to you that that is a
13 transcript for the investigative hearing that was
14 held regarding you on September 18th of 2014 and
15 the copy I put in front of you does not have the
16 exhibits, and do you, I guess, do you have any
17 reason to question whether that's a transcript of
18 those proceedings?
19    A.  No.
20    Q.  Okay.  All right.  So following up on the
21 November 2013 letter from Mr. Wright where he had
22 indicated you had had seven layoffs so far in 2013,
23 since you had been approved for FMLA leave, there's
24 some indication that's here in the transcript that
25 by July of 2014, you had had 17 layoffs during that

26 (Pages 98 - 101)

Case 4:16-cv-01013-GAF   Document 131-1 Filed 06/16/17   Page 26 of 39
800-567-8658                                                973-410-4040

1 one-year period for which you had been approved,
2 and based on your prior responses, I'm assuming you
3 agree with that number?
4    A.   From my knowledge, yes.
5    Q.   Okay.  And you received a notice, which I
6 think you've seen before, that they were going to
7 do what's called take this matter to an
8 investigation, correct?
9    A.   Correct.
10    Q.   Regarding whether you had violated certain
11 rules, correct?
12    A.   Correct.
13    Q.   And you, obviously since we have a
14 transcript, just, we state the obvious sometimes in
15 these depositions, you did not waive your right to
16 the investigation, you participated in it, correct?
17    A.   Yes.
18    Q.   So just to draw a little bit of framework
19 on the investigation, you attended the
20 investigation, correct?
21    A.   Yes.
22    Q.   And you had your union representative Mr.
23 Holtcroft, correct?
24    A.   Yes.
25    Q.   And then the hearing officer was James

1 Tylick, correct?
2    A.   Yes.
3    Q.   And I believe the only other witness who
4 testified other than you was Darren Compton,
5 correct?
6    A.   Correct.
7    Q.   And Mr. Compton at that time when the
8 investigation was held in September of 2014, he was
9 the Director of Administration, correct?
10    A.   Yes.
11    Q.   And he had replaced Mr. Wright?
12    A.   I, I guess, I don't know if he did or not.
13    Q.   Was there some discussion during the
14 investigation that Mr. Wright had retired?
15    A.   I don't recall.
16    Q.   Okay.  But when, I know we touched on this
17 earlier, you had a chance to ask questions during
18 that investigative hearing, correct?
19    A.   Yes.
20    Q.   And your union representative had the
21 right to ask questions during that hearing,
22 correct?
23    A.   Yes.
24    Q.   And you were asked some questions and you
25 gave answers, I presume, truthfully to the best of

1 your ability to those questions, right?
2    A.   Yes.
3    Q.   Now, if we look on the transcript here, if
4 you turn to Page 12, and I want you, if you would,
5 I'm going to get kind of specific here just so you
6 read to yourself the part I'm directing you to, if
7 you look and read to yourself Page 12, lines 25 to
8 26, which is the last two lines, and then Page 13,
9 lines 1 through 13, and just let me know when
10 you're done.
11    A.   I'm done.
12    Q.   Okay.  So if I can summarize here, this
13 indicates that BNSF, that Mr. Compton, when he's
14 testifying on behalf of BNSF, is indicating that
15 there was some sort of audit and during that audit,
16 they determined that between September 11th, 2013
17 and July 25th, 2014, you had laid off 17 times for
18 FMLA, is that kind of a fair summary --
19    A.   Yes.
20    Q.   -- of what Mr. Compton said?
21    A.   Yes.
22    Q.   Okay.  And that included five times in
23 June and five in July, correct?
24    A.   Correct.
25    Q.   Okay.  And you were only authorized,

1 according to what Mr. Compton was saying, four
2 absences for that one-year period?
3    A.   Correct.
4         (Defendant's Exhibit 18 marked for
5              identification)
6    Q.   (By Mr. Vogel)  Mr. Oropeza, I'm going to
7 see if you can help me out on a couple of exhibits
8 here.  I'm going to hand you what's been marked for
9 purposes of your deposition as Exhibit 18, it was
10 Exhibit 9 in the investigative hearing, and it's a
11 two-page document numbered for production D-266 to
12 D-267, and I believe what this was presented as was
13 a series of days on which you had taken FMLA leave,
14 do you recall that exhibit being introduced at the
15 investigation?
16    A.   Yes.
17    Q.   And it goes in reverse chronological
18 order, so on the second page it starts with
19 September 19th, 2013 and then it runs up until July
20 24th, 2014, right?
21    A.   That's correct.
22    Q.   Okay.  And I believe they have some sort
23 of code for FMLA usage with the letter T, and
24 that's what runs down there under FMLA type, do you
25 see that?

27 (Pages 102 - 105)

1    A.   Yes.
2    Q.   Okay.  Can you help me understand, you had
3  sort of explained that if you call in and take off
4  one day, it can turn into multiple days because of
5  the type of assignment that you had, right?
6    A.   Correct.
7    Q.   Can you tell from this list here where
8  your call-in involved multiple days, so for
9  example, if you called in and took FMLA on
10 September 19th, is it a suggestion there that that
11 covered an assignment that ran until September
12 21st?
13   A.   Yeah, I don't kind of recall this, I mean,
14 understand this type of format, how they have it.
15   Q.   Okay.  So for example, just look at the
16 second page, what I'm wondering, see there at the
17 very last line sort of as the "begin tracking
18 date", it says "9/19/2013"?
19   A.   Yes.
20   Q.   And then there's an end tracking date just
21 over there two columns to the right that's a
22 September 21st, 2013?
23   A.   Yes.
24   Q.   That's just what I'm trying to figure out,
25 is that a situation where you you would have had an

1  assignment that started on the 19th and ran to the
2  21st or can you tell?
3    A.   Oh, that is probably the time I've laid
4  off and the, I'm assuming the time that layoff time
5  expired.
6    Q.   Got you.  And if you can look at Page 18
7  of the transcript, lines 22 through 26 and then
8  Page 19, lines 1 through 4.
9    A.   Okay, I'm done.
10   Q.   Okay.  And that's a portion of the
11 transcript that involves some questions being asked
12 to Mr. Compton, who is testifying on behalf of the
13 railroad, by Mr. Holtcroft, your union
14 representative, correct?
15   A.   Correct.
16   Q.   And Mr. Holtcroft asks there at the
17 beginning of the portion I asked you to read "Mr.
18 Compton, what part of Exhibit Number 11 1.6 did Mr.
19 Oropeza not comply with" and what he's asking him
20 about there, we understand from looking at
21 other documents, is That General Rule of Operating
22 Conduct Rule 1.6, right?
23   A.   Correct.
24   Q.   Okay.  And Mr. Compton responds "he did
25 not comply with disrespect or negligence affecting

1  interest of the company.  Mr. Oropeza did not
2  follow the instructions issued by Mr. Greg Wright
3  and by the days he was allowed to layoff set forth
4  in Exhibit 5 after his healthcare provider provided
5  the number of days that he would need for this
6  medical condition".  And I took out two "uhs" there
7  just to clean it up, but that's what, they get
8  those down, really every exact sound made in those,
9  but that's what Mr. Compton said in response to Mr.
10 Holtcroft's question, correct?
11   A.   Correct.
12   Q.   And then if turn all the way to Page 55,
13 I'm going to jump around a little, so I apologize
14 in advance.  I'll just try to short circuit this
15 one, but on Pages 4 -- I'm sorry, Page 55, lines 4
16 to 8, there's a question to you by Mr. Tylick,
17 correct?
18   A.   Yes.
19   Q.   And he refers to an objection and then
20 restates the question, but he says "I asked if he
21 understands the provisions of G-COR 1.3 and 1.13
22 and allow him an opportunity to answer Mr.
23 Oropeza?", and your answer was "yes", correct?
24   A.   Correct.
25   Q.   And that wasn't entirely clear from the

1  provision I just read, but what you are essentially
2  saying there, just as you said to me earlier today,
3  is that you understand rule 1.3 and rule 1.13,
4  right?
5    A.   That's correct.
6    Q.   Let's look at Page 26 of the transcript,
7  and they talk about some of the documents that
8  we've talked about today in terms of letters that I
9  believe we've also already introduced into this
10 transcript, but if you look at line 9, Mr. Tylick
11 -- I'm sorry, if you look at line 24 to 25, Mr.
12 Tylick asked you "did you layoff FMLA more than
13 what Exhibit 5 and 7 allowed", and I'll represent
14 to you that Exhibit 5 was the letter to you from
15 the HR Benefits Center approving you for
16 intermittent leave and Exhibit 7 was Mr. Wright's
17 letter to you of November 14th of 2013, and it will
18 bear itself out in the transcript, and you answered
19 to that "yes", correct?
20   A.   Yes.
21   Q.   So in response to Mr. Tylick's questions,
22 you agreed that you were laying off more than what
23 you had been approved for in the letter from BNSF,
24 correct?
25   A.   Correct.

Page 110

1    Q.   Now, on Pages 27 and 28, again this whole
2  thing will be in the record and you can take some
3  time to read that if you want, but you did explain
4  in your testimony that your mother's condition was
5  unpredictable and you could need more than four
6  absences per year to deal with it, correct?
7    A.   Yes.
8    Q.   And you said she needed help with everyday
9  life activities, correct?
10    A.   Yes.
11    Q.   Okay.  Let me ask you this; in terms of
12  the situation with your mom, were there other
13  resources that your mom had available to provide
14  her with any care?
15    A.   Like, can you?
16    Q.   Sure.  Did your mom have any in-home care
17  during this time period?
18    A.   I think she had a therapist.
19    Q.   Who would actually come to the home?
20    A.   I think so.
21    Q.   How often?
22    A.   I want to say maybe once or twice a week.
23    Q.   And I want to ask if there were times when
24  your, were there times when your wife provided care
25  to your mother?

Page 111

1    A.   Sometimes.
2    Q.   Do you know if your wife ever requested
3  FMLA in order to be able to care for your mom?
4    A.   No.
5    Q.   You don't know one way or the other or --
6    A.   No, she never requested it.
7    Q.   How about your sister, did she ever
8  provide care to your mom?
9    A.   At some point, she was in school or going
10  to school at the time.
11    Q.   She never lived with you, right?
12    A.   No.
13    Q.   To your knowledge, did anyone else provide
14  assistance or care for your mom in the home besides
15  the physical therapist who might come one to two
16  times a week, maybe your wife on occasion and maybe
17  your sister on occasion, were there any neighbors,
18  any of your children who were closer to adulthood,
19  anything like that?
20    A.   No.
21    Q.   If you can look at Page 36 of the
22  transcript, if you look at that page, I think it
23  gives you context even from Page 1 that would have
24  confirmed that Exhibit 5 that we were talking about
25  was the approval you got from the HR Benefits

Page 112

1  Processing Team for your FMLA leave, right?
2    A.   That's correct.
3    Q.   Okay.  And if you look at lines 5 to 6,
4  and then your answer on line 7, Mr. Tylick says
5  "and Exhibit 5 states four absences per year, one
6  day duration, correct", and your answer is "yes",
7  right?
8    A.   Correct.
9    Q.   And then he next asks you "did you get
10  anything other than Exhibit 5 that said you were
11  approved for more than four absences per one year
12  duration" and your answer was "no", correct?
13    A.   Correct.
14    Q.   And on the certifications, we've looked at
15  a couple of them, there are some questions on there
16  and some information about the kind of care as a
17  whole that your mom needs, right?
18    A.   Correct.
19    Q.   But then there's also a section about how
20  much time you as a BNSF employee need to miss work,
21  right?
22    A.   Correct.
23    Q.   Those are different questions, aren't
24  they?
25    A.   Yes.

Page 113

1    Q.   Because if you agree with me, without
2  getting into a whole back and forth necessarily,
3  but there's some situations where folks provide
4  care where that care can be provided without an
5  individual needing to leave work to provide that
6  care, right, I mean, that could certainly happen?
7    A.   It can happen.
8    Q.   Okay.  And there can be situations where a
9  person needs care and someone other than the
10  employee/family member might be the one to provide
11  that care, right?
12    A.   Yes.
13    Q.   And I know I've asked this to you probably
14  in some different ways, but I'm just going to try
15  to ask it really specifically for this portion of
16  our deposition; can you explain why you did not get
17  Dr. Dubinsky to provide an updated certification
18  that indicated in section 9 that you would need to
19  miss more than four days per year on an
20  intermittent basis?
21    A.   I've explained to him on probably one or
22  two occasions about my situation with my job and
23  how it could effect me losing my job, and he
24  basically just filled it out and this is, I mean, I
25  don't know what else to put on there or what

29 (Pages 110 - 113)

1 they're asking for me to do, he goes, "it's
2 unpredictable sicknesses", he says "I'm just basing
3 off your mom's doctors appointments and I can't
4 prevent, I don't know when her flare-ups will
5 happen, it's just unpredictable", and that's the
6 answer he gave me.
7    Q.   I want to jump down to something we were
8 talking about a few minutes ago, if you can look at
9 Page 45, lines 24 to 26 and then Page 46, lines 1
10 through 12, I just want to ask you a couple of
11 questions about that if I could.
12    A.   What line Number on 45?
13    Q.   24 to 26.
14    A.   Okay.
15       (Defendant's Exhibit 19 marked for
16          identification)
17    A.   Okay.
18    Q.   (By Mr. Vogel)  So that's some questions
19 that Mr. Compton is asking -- is answering in
20 response to questions by Mr. Holtcroft, I didn't
21 word that very well, sorry, but Mr. Compton is
22 explaining there, do you agree with me that what
23 he's saying is that if you took an FMLA layoff on
24 one day, but that that day covered a multiple day
25 assignment, they just counted that as one FMLA

1 layoff?
2    A.   That's correct.
3    Q.   Let me hand you what's been marked as
4 Exhibit 19, which is numbered for production D-273
5 to 275, and this was utilized as Exhibits 13 and 14
6 at the investigation and is this the document that,
7 at least according to BNSF, kind of bears this out,
8 in other words, what they've done is this is a
9 print-out that shows some FMLA layoffs on a series
10 of dates that appear to cover multiple days and
11 someone has numbered there off to the left how they
12 get from 1 to 17.
13    A.   Yes.
14    Q.   So for example, just on the first one, it
15 looks like that's an FMLA layoff that started on
16 September 19th, 2013 and carried over into
17 September 20th, 2013, but it's just recorded there
18 as, someone put in it the margin as one FMLA
19 occurrence?
20    A.   Correct.
21    Q.   Okay.
22       (Defendant's Exhibit 20 marked for
23          identification)
24    Q.   (By Mr. Vogel)  I'm going to hand you
25 what's been marked as Exhibit 20, which is an

1 e-mail string numbered D-186 to 187, and like
2 e-mail strings, it starts at the bottom.  First let
3 me ask; have you seen this e-mail string before?
4    A.   No.
5    Q.   Okay.  And the bottom one is from Mr.
6 Tylick who was the hearing officer at the
7 investigation, right?
8    A.   Yes.
9    Q.   And it's dated Thursday, September 25th,
10 2014, which is about a week after the investigation
11 hearing, right?
12    A.   That's correct.
13    Q.   And he sends it to something that says
14 PEPA and we've seen this shorthand before, that's
15 the Policy For It Employee Performance
16 Accountability, right?
17    A.   That's correct.
18    Q.   And he copies Mr. Dickerson and Mr.
19 Compton, and Mr. Compton had testified at the
20 investigation hearing, right?
21    A.   Yes.
22    Q.   And it says, "subject; dismissal
23 investigation for review FA Oropeza", and that's
24 obviously you, correct?
25    A.   Yes.

1    Q.   And Mr. Tylick writes, and he doesn't
2 reference anyone's name, he just writes "PEPA,
3 please review this investigation draft for TY&E
4 employee FA Oropeza to determine your support for
5 dismissal.  This event would be a second level S
6 violation.  Employee currently on an active level S
7 from January 2012 with 36-month review".  When we
8 talked about it before, that active level S that
9 we're referring to there, that was the level S for
10 the incident with the failing to comply with
11 instructions on the loaded steel movement
12 restrictions, right?
13    A.   I think, I believe so.
14    Q.   Okay.  And that, just to be clear, that
15 didn't have anything to do with FMLA, right?
16    A.   That's correct.
17    Q.   Okay.  And it says "the investigation
18 charges Mr. Oropeza with a G-COR 1.6 and G-COR 1.13
19 violation for failure to comply with instructions
20 issued by DOA Greg Wright dated November 14th, 2013
21 concerning frequency and duration of FMLA
22 absences".  And essentially, again I think we've
23 been over it a couple of times, but just so we're
24 on the same page, your understanding of BNSF's
25 position with regard to your dismissal is that Mr.

Page 118

1 Wright sent you this letter indicating "you're
2 taking more leave than it says you're entitled to
3 in this letter, so either get us a new
4 certification giving you more leave or stick with
5 the amount of leave that you've been given in this
6 letter", that's essentially what he said, right?
7    A.   Yes.
8    Q.   And then BNSF took the position that when
9 you took additional leave after that that you were
10 failing to comply with those instructions, right?
11    A.   I disagree because I, I did comply with
12 the instructions because they told me to provide,
13 or try and update my medical history, or my
14 application, which I gave to my mom's doctor, so I
15 never told them no, I never was trying to be
16 insubordinate.
17    Q.   And I appreciate that.  But didn't we just
18 agree that you answered a question in the
19 investigation where they said "did you ever provide
20 anything that gave more than four days off per
21 year", and you said "no"?
22    A.   I think so, yes.
23    Q.   Okay.  So I understand your testimony is
24 you reached out and tried to get something --
25    A.   Yes.

Page 119

1    Q.   -- but at the end of the day, you didn't
2 get anything from the doctor?
3    A.   I don't recall.
4    Q.   Okay.  Well, according to Mr. Tylick's
5 summary here and those were sort of the pages I was
6 reading back to you from the transcript that "Mr.
7 Oropeza stated that his FMLA had exceeded what was
8 allowed" and he cites page 26 and 41, "and stated
9 that he did not receive updated approval outside of
10 Exhibits 5 to 7", which are the letters we've been
11 talking about, "allowing additional FMLA absences
12 other than four times per year" and he cites Page
13 36, right?
14    A.   Yes.
15    Q.   Okay.  And then just the last part of the
16 e-mail, he's talking about the timing with which
17 they have to make a decision, right?
18    A.   Yes.
19    Q.   And that stuff, in terms of procedural
20 rules, is set forth under the Collective Bargaining
21 Agreement, right?
22    A.   Yes.
23    Q.   Okay.  So if we go up to the next line,
24 you've got a message four days later and there was
25 a weekend in there, on Monday, September 29th,

Page 120

1 2014, from someone named Derrick Cargill on behalf
2 of PEPA, do you know who Mr. Cargill is?
3    A.   No, I don't.
4    Q.   You've never met him?
5    A.   No.
6    Q.   You've never talked to him?
7    A.   No.
8    Q.   And he says "I have reviewed the
9 transcript and exhibits from Mr. Oropeza's
10 investigation along with his personnel record.
11 Based on my review, I recommend dismissal".  So
12 it's stating the obvious here about your, he's
13 saying he looked at the transcript from your
14 investigation hearing, right?
15    A.   Yes.
16    Q.   And he looked at the exhibits that were
17 introduced in that investigation hearing, right?
18    A.   Yes.
19    Q.   And it says he looked at your personnel
20 record, do you know what he's referring to by that?
21    A.   I just believe my work history or whatever
22 is basically on the computer system.
23    Q.   Okay.  Which could include your
24 disciplinary history, right?
25    A.   Yes, that's correct.

Page 121

1    Q.   Just for the record, one of the things in
2 your disciplinary history is that you had been
3 dismissed and then later reinstated because of
4 attendance issues, right?
5    A.   That's correct.
6    Q.   And there was also some language in your
7 disciplinary history that indicated that you had
8 previously received letters similar to the letter
9 Mr. Wright sent you and had some disciplinary
10 citations for failing to comply with instructions
11 related to those letters, correct?
12    A.   That's correct.
13    Q.   And Mr. Cargill goes on to write "the
14 charges were proven with substantial evidence and
15 the investigation was procedurally solid.
16 Following the November 14th, 2013 notice letter,
17 Mr. Oropeza continued to lay off in excess of the
18 amount of days for which he was approved".  That
19 second sentence, that's accurate, right?
20    A.   I don't recall.
21    Q.   Well, you got the notice letter, right?
22    A.   The second, on the second paragraph?
23 This?
24    Q.   Yes, sir.  That's accurate, whether you
25 believe you should have gotten more time, I

31 (Pages 118 - 121)

1 understand that that's part of the case, but in
2 terms of the fact that there was a letter approving
3 you for a certain number of days, you got the
4 November 2013 letter from Mr. Wright and you
5 continued to lay off FMLA for more than the days
6 that had been set out in the original letter.
7    A.  Correct.
8    Q.  Okay.  It states "he clearly failed to
9 comply with the written instructions from Mr.
10 Wright, which is his second level S violation.
11 Notably, this is Mr. Oropeza's 14th discipline
12 event since 2006.  Let me know if further
13 discussion is needed".  I think if we went back and
14 counted up in the Employee Transcript, it does
15 count up to 14, do you disagree with that?
16    A.  I agree.
17    Q.  Okay.  So do you understand now or did you
18 your union ever explain to you, just so we can draw
19 some context, that this is kind of the process that
20 BNSF goes through before dismissing an employee?
21 In other words, they have the investigation
22 hearing, and then the investigation hearing is
23 reviewed by someone within PEPA?
24    A.  I believe so.
25    Q.  Okay.

1      (Defendant's Exhibit 21 marked for
2           identification)
3    Q.  (By Mr. Vogel)  Let me hand you what's
4 been marked as Exhibit 21.  It's an e-mail from Mr.
5 Cargill, who we just talked about a minute ago, to
6 somebody named Milton Siegele, do you know who Mr.
7 Siegele is?
8    A.  No, I don't.
9    Q.  That one is dated September 8th of 2014,
10 correct?
11    A.  Correct.
12    Q.  And that is actually a couple of months
13 after you were dismissed, right?
14    A.  That's correct.
15    Q.  And he writes in here "Milton, Case Number
16 13 involves the dismissal of Frank Oropeza".  Let
17 me ask you this; was there, after you were
18 dismissed, you worked through your union to attempt
19 to grieve the dismissal, correct?
20    A.  That's correct.
21    Q.  There were some labor-related proceedings
22 involved in this, right?
23    A.  Yes.
24    Q.  And were those labor-related proceedings
25 going on in that December 2014 time frame, do you

1 know?
2    A.  I believe so, I really don't know.
3    Q.  It would make sense, right?
4    A.  Yes, it does.
5    Q.  Okay.  And he writes "I wanted to make you
6 aware that Mr. Oropeza was dismissed previously in
7 June 2009 for an attendance violation.  He was
8 subsequently reinstated without pay on a last
9 chance basis in February of 2010", and that's
10 accurate, right?
11    A.  That's correct.
12    Q.  And he writes "this was a leniency
13 reinstatement and not the result of an arbitration
14 reward".  I think I asked you this morning if you
15 knew whether the reinstatement was part of an
16 arbitration award and I think you said you didn't
17 remember?
18    A.  Yes.
19    Q.  Does this refresh your recollection at
20 all?
21    A.  Yeah, I don't, I don't remember.
22    Q.  Fair enough.  And the date of your
23 dismissal was September 30th, 2014, correct?
24    A.  I think it was the 29th.
25    Q.  29th?

1    A.  Yes.
2    Q.  Okay.
3    A.  September 29th, did you say December?
4    Q.  No, I thought I said September, but if I
5 misspoke, I apologize.
6    A.  I'm looking at the e-mail, I'm sorry.
7    Q.  That's okay.  We think your dismissal was
8 on or about September 29th, 2014.
9    A.  Correct.
10      (Defendant's Exhibit 22 marked for
11           identification)
12    Q.  (By Mr. Vogel)  I'm going to hand you
13 what's been marked Exhibit 22, it's a multi-page
14 document marked for production D-22 to 27, and this
15 is yet another Certification of Healthcare Provider
16 form that Dr. Dubinsky's office completed, right?
17    A.  Yes.
18    Q.  And on the last page, you signed this on
19 September 17th, 2014, right?
20    A.  Yes.
21    Q.  And that is the day before the
22 investigation that resulted in your dismissal,
23 correct?
24    A.  Correct.
25    Q.  And it was actually after the one year

1 period that you had been approved for leave in the
2 September 11, 2013 to September 10th, 2014 had
3 expired, right?
4    A.  Yes.
5    Q.  So on this one, it will all be in the
6 record and speak for itself, but if you look at the
7 fourth page, which is marked D-26, under section 5
8 "employee time away from work", under the
9 "continuance absence" part on this one, whoever
10 fills it out, put "n/a", which we can all agree is
11 shorthand for "not applicable", right?
12    A.  Yes.
13    Q.  Then on "intermittent absence", it says
14 "general care", there's an "n/a" there as well,
15 right?
16    A.  Correct.
17    Q.  Okay.  And what that's referring to, and
18 it is tough for me to read too, and tell me if you
19 can't, but it says under "general care", "if so
20 this can include intermittent or reduced scheduled
21 care needed for assistance with ADL not associated
22 with a flare-up", do you understand ADL to stand
23 for activities of daily living?
24    A.  Yes.
25    Q.  So then on the next box, it says

1 "treatment", and someone has written off to the
2 side there "doctor visits, two to three number of
3 absences per year", right?
4    A.  Correct.
5    Q.  And then under "flare-ups", it says "based
6 on the patient's medical history and your knowledge
7 of the medical condition, estimate the frequency of
8 flare-ups and the duration of related incapacity
9 that the patient may have", and it says "four
10 absences per year with duration of one to three
11 days", right?
12    A.  Correct.
13    Q.  And then under "comments", it says "we can
14 not predict our patient's future health or her
15 flare-ups.  She may have more than what is stated
16 above", right?
17    A.  Correct.
18    Q.  Okay.  And understanding and including the
19 comment that's there under "other", this as written
20 estimates six to seven absences per year, right?
21    A.  Yes.
22    Q.  And for the visits, those would just be
23 one day absences, right, the doctor visits?
24    A.  Correct.
25    Q.  And then on the other four, it says one to

1 three days, correct?
2    A.  Yes.
3    Q.  Okay.  Actually jumping back to that one
4 for a second.  There's a line on that "employee
5 time away from work", it says "total" and someone
6 has written there "four absences per year with
7 duration of one to three days", right?
8    A.  Yes.
9    Q.  And there's a reference in that
10 certification, and we can find it if you need to,
11 but there's a reference in there to something
12 called DBS programming, have you heard that term
13 before?
14    A.  I, I don't recall, but it kind of sounds
15 familiar.
16    Q.  I don't know what it is, I just wondered
17 if you had any idea what it was in terms of
18 something that was explained to you by your mom or
19 any of her healthcare providers.
20    A.  I'm assuming it has to do with her
21 stimulation.
22    Q.  Okay.  Would you actually help with your
23 mom's treatment?
24    A.  No.
25    Q.  Okay.  You would take her to and from

1 appointments, right?
2    A.  Correct.
3    Q.  And there were times where she just
4 couldn't do things she needed to do around the
5 house, so to speak, right?
6    A.  That's correct.
7    Q.  And so you would need to help her with
8 those things, right?
9    A.  That's correct.
10    Q.  Cooking, cleaning, grooming, those sorts
11 of things?
12    A.  Yes.
13    Q.  Anything other than that that you needed
14 to do to care for her?
15    A.  I had to do her medications for a week.
16    Q.  Okay.  Do her medications for the week?
17    A.  Yes.
18    Q.  Tell me how that would work.
19    A.  Well, she would require a certain amount
20 of medication per day and then I would do her pill
21 box and probably maybe seven, eight pills a day
22 including her vitamins, and then I would do it for
23 a week so all she would have to do is open it and
24 take those pills for the day.  It was, like for
25 example, Monday morning, noon, evening and bedtime,

33 (Pages 126 - 129)

1 and they would be for a seven-day box that I would
2 have to get prepared for her for every week.
3    Q.  Okay.  So you had to do that at the
4 beginning of the week, right?
5    A.  Yes.
6    Q.  And then it would be done, right?
7    A.  Correct.
8    Q.  And is that something that you had to
9 leave work to do or is that something that you
10 could work your schedule?
11    A.  When I was there caring for her, I would
12 do it at the same time.
13    Q.  Okay.  So the doctors appointments, let's
14 kind of set those aside, you can plan ahead
15 generally for doctors appointments, right?
16    A.  Yes.
17    Q.  You know when those would be, you know the
18 time you need to take off, and you'd make
19 arrangements and take an FMLA layoff so you could
20 take your mom to and from the doctor, right?
21    A.  Yes.
22    Q.  And was that generally three or four times
23 a year?
24    A.  Sometimes, sometimes she would need to get
25 in there as soon as possible.

1    Q.  Okay.  And I understand you've explained
2 the medication plan and then we talked about
3 there's other times where you just needed to do
4 things for her that she couldn't do for herself
5 because of her condition, right?
6    A.  Correct.
7    Q.  And tell me, if you can, about the
8 circumstances under which you need to take time off
9 to do that?
10    A.  Like her health conditions.
11    Q.  Sure.  So for example, tell me, I'm just
12 trying to get an understanding of this, would she,
13 you lived with her for a period of time and for a
14 period of time you didn't live with her, right?
15    A.  Correct.
16    Q.  So would it be a situation where she would
17 tell you "I'm unable to do A, B and C activities
18 today, so you're going to need to stay home from
19 work and help me"?
20    A.  Well, she was a fall hazard and she, the
21 doctor recommended that she try and not do any
22 activity as cooking and cleaning because she could
23 probably maybe burn herself and stuff like that,
24 for example, and she couldn't, they didn't want her
25 carrying any type of, anything heavy over five

1 pounds, which would basically be like her laundry
2 or anything that has to do with any lifting, that
3 would cause her balance to cause her to fall, and
4 it was just simple, I mean, regular stuff that me
5 and you could do that she couldn't do.
6    Q.  Sure.  What I'm trying to figure out, I
7 know you're in a different situation and I'm
8 understanding that, but those sound like things she
9 needs help with every day, right?
10    A.  Some days were fine and some days were
11 not, it's just hard to tell, I mean...
12    Q.  So the condition would flare up, she would
13 need your help to do these things that she needed
14 done and there was no one else to do them?
15    A.  Correct.
16        (Defendant's Exhibit 23 marked for
17          identification)
18    Q.  (By Mr. Vogel)  Okay.  I'm going to have
19 you compare Exhibit 22 and Exhibit 23 a little bit
20 just to go through this last BNSF document.  This
21 is Exhibit 23, which is numbered for production
22 D-18 to D-20, and this is a letter to you from
23 BNSF's HR Benefits Processing Team dated September
24 23rd, 2014, right?
25    A.  Correct.

1    Q.  And you remember getting this letter,
2 right?
3    A.  Yes.
4    Q.  And this is about a week before you got
5 dismissed, correct?
6    A.  Yes.
7    Q.  Okay.  But they are approving a request
8 for intermittent leave for the period of September
9 17th, 2014 through September 16, 2015, right?
10    A.  Yes.
11    Q.  And this indicates that they received the
12 request on September 17th, 2014, right?
13    A.  Yes.
14    Q.  So that would be a reference to the
15 certification of Exhibit 22, right?
16    A.  That's correct.
17    Q.  Okay.  So they write in here the that the
18 request is approved, and then in the third
19 paragraph they say "the doctor has indicated that
20 you may need four absences per year lasting one to
21 three days each absence", right?
22    A.  Correct.
23    Q.  Okay.  Let's just see if we can translate
24 this.  On Exhibit 22, on the next to last page, the
25 third paragraph, the doctor has indicated, they

Case 4:16-cv-01013-GAF   Document 31-1  Filed 06/16/17  Page 34 of 39
Veritext Legal Solutions
800-567-8658                                     973-410-4040

1 appear to be taking that last line in the "employee
2 time away from work" section where they're taking
3 the total to get there, to get the information in
4 that paragraph, right?
5    A. Yes.
6    Q. And if you read it, there's actually two
7 separate areas in which the doctor's writing that
8 you might need time off, correct?
9    A. Yes.
10    Q. But the doctor didn't really, or someone
11 from the doctor's office didn't really add up the
12 treatment line and the flare-ups line, right?
13    A. That's correct.
14    Q. Okay. So if the doctor had added those
15 lines, it presumably would have totaled something
16 like two to three absences per year of one day for
17 doctor visits, and four absence per year, one to
18 three days each, right, they both would have been
19 in there, correct?
20    A. Yes.
21    Q. And I know you weren't there for very long
22 after you got this record, this letter, but did you
23 contact anyone at the HR Benefits Processing Team
24 to notice, to note what appeared to be a difference
25 between what the employee time away from work box

1 said and what this letter said?
2    A. I really don't, I really didn't pay
3 attention to, I was just, I just basically
4 contacted them just to see if they received this,
5 or the documentation that my doctor provided.
6    Q. Okay. Did you bring this certification,
7 this September 17th one, Exhibit 22, to the
8 investigation hearing with you?
9    A. I don't recall.
10    Q. Okay. Your attorney and our attorney team
11 are going to have some discussions about some
12 additional discovery in this case, but I want to
13 ask in terms of your knowledge, are you aware of
14 other scheduled employees that you believe took
15 more FMLA time than they had been allotted in an
16 approval letter and were not disciplined for doing
17 so?
18    A. I believe so.
19    Q. Okay. How many?
20    A. Probably maybe four --
21    Q. Okay.
22    A. -- five.
23    Q. Can you tell me those gentlemen's, or
24 ladies or gentlemen's names?
25    A. Man, what were there names?

1    Q. And I'll preface this, just so we're safe
2 here, I don't want to know anything about the
3 condition that they were taking leave for, I want
4 to know the employee's names, and then we'll go
5 further into it.
6    A. Man, I've got first names, it's just the
7 last names, it's been so long since I've...
8    Q. Okay. Let's try first names and maybe we
9 can get some other identifying information.
10    A. Okay. His name is Daniel.
11    Q. And was Daniel, do you know what Daniel's
12 job was?
13    A. He was a switchman.
14    Q. In the Kansas City area?
15    A. Yes.
16    Q. Who reported to Lincoln?
17    A. No, he was in the Kansas side, I believe,
18 Kansas division side.
19    Q. That reports to Topeka?
20    A. Which is Kansas City -- our Kansas City,
21 Kansas, Argentine.
22    Q. So Daniel was a switchman in the Kansas
23 City, Kansas area?
24    A. Correct.
25    Q. And where do you get the knowledge about

1 his FMLA? Did he tell you or did you see
2 documents?
3    A. I just overheard.
4    Q. And what did you overhear?
5    A. That he had FMLA.
6    Q. You heard him say that?
7    A. Yes.
8    Q. And what led you to conclude that he was
9 exceeding the amount of FMLA he had been given
10 permission to take in a letter?
11    A. He was never at work.
12    Q. But just as we sit here today, you don't
13 know how much leave he requested?
14    A. No.
15    Q. Or how much he was granted?
16    A. No.
17    Q. Okay. It seemed like he was gone a lot?
18    A. Yes.
19    Q. Okay. Anybody else?
20    A. Mike, and he was a switchman.
21    Q. In Argentine?
22    A. Yes.
23    Q. What leads you to believe that he exceeded
24 the amount of FMLA that he had been approved for?
25    A. The same reason that Daniel.

Exhibit A

1 Q. He just seemed to mis a lot of work?
2 A. Correct.
3 Q. Any others?
4 A. I can't recall any other names.
5 Q. Do you know how Daniel self-identifies in
6 terms of race?
7 A. White.
8 Q. How about Mike?
9 A. White.
10 Q. And sort of the same question, but I just
11 want to make sure I've covered it, are you aware of
12 any employees who are not Hispanic who you believe
13 exceeded attendance guidelines but were not
14 disciplined for doing so?
15 A. Yes.
16 Q. And would Daniel and Mike be in that
17 category?
18 A. Yes.
19 Q. Any others?
20 A. Christy Welson.
21 Q. Christy Welson?
22 A. Yes, W-E-L-S-O-N.
23 Q. Okay. What did Christy Welson do?
24 A. Well, she violated a lot, rule violations.
25 Q. I'm sorry, what was her job?

1 A. Oh, I'm sorry.
2 Q. That's okay. Bad question.
3 A. She was an engineer.
4 Q. In your group?
5 A. I believe she was on the Kansas division.
6 Q. Okay. What rules did she violate?
7 A. It was, I don't, I don't recall the name
8 of the rule, but it was a rule violation where you
9 basically rear-ended a train or not, basically not
10 complying with instructions.
11 Q. And do you know what, if any, discipline
12 she received?
13 A. She just received a probation, a level,
14 that level S, with that three-year probation.
15 Q. Do you know if she had any additional
16 rules violations within that three year --
17 A. She had another incident, the same, I
18 believe it was the same incident, maybe got past a
19 signal.
20 Q. And how do you know that?
21 A. It is what they, the guys down there were
22 saying, and she mentioned that she got in trouble.
23 Q. Have you ever actually seen her Employee
24 Transcript?
25 A. No.

1 Q. Anyone else?
2 A. Paul Jacobson.
3 Q. What did Mr. Jacobson do for a living at
4 BNSF?
5 A. He was an engineer.
6 Q. What division?
7 A. My division, Nebraska, Springfield,
8 /Springfield.
9 Q. Okay. What did he do in terms of a rules
10 violation that you think he was, received lesser
11 discipline than you?
12 A. He rear-ended a train, he got past a
13 signal and abandoned his train before authorities
14 got there.
15 Q. And do you know if he received any
16 discipline for that?
17 A. I have, I don't know.
18 Q. You've never seen his Employee Transcript?
19 A. No, and got over a D rail, he ran over a D
20 rail.
21 Q. Two separate incidents?
22 A. Three.
23 Q. Three, okay.
24 A. Or a total of three, which the rear-end
25 was one, the got past the signal is a second and

1 then the D rail is a third one.
2 Q. And how do you know that he did these
3 things -- I mean, are we talking again about sort
4 of --
5 A. He just told everybody, you know, he just
6 told that "I might be getting in trouble", just out
7 of conversation.
8 Q. Anyone else?
9 A. I think that's about it.
10 Q. Okay. Did any members of your leadership
11 team ever make any statements that you directly
12 heard that you believe reflected some sort of
13 animus towards Hispanics?
14 A. I don't recall.
15 Q. I want to be real specific about it, did
16 you ever hear Joe Dickerson say anything that you
17 believe indicated some sort of animus against
18 Hispanics?
19 A. No.
20 Q. What about Jim Tylick, did you ever hear
21 Jim Tylick say anything that you believe indicated
22 some sort of animus against Hispanics?
23 A. No.
24 Q. Did you ever hear Darren Compton saying
25 anything that reflected any animus towards

1 Hispanics?
2    A.  No.
3    Q.   Just to make sure I covered it, I asked
4 you if you heard anything, did anyone ever tell
5 you, so secondhand information you may have heard
6 in which somebody said "hey, Frank, this manager
7 made a comment that", they probably didn't say it
8 this way, but "reflect an animus towards
9 Hispanics"?
10    A.  No.
11    Q.   Did you ever raise any sort of internal
12 complaint that you were being discriminated against
13 or treated differently because you're Hispanic?
14    A.  No.
15    Q.   Did you ever file a grievance alleging
16 race discrimination?
17    A.  No.
18    Q.   Are you aware of any other Hispanic
19 employees who you believe violated rules and that
20 received lesser discipline than you did?
21    A.  No.
22    Q.   Are you aware of any Hispanic employees
23 who you suspect or believe exceeded the amount of
24 FMLA time for which they had been approved and
25 avoided discipline?

1    A.  No.
2    Q.   When was the last time you talked to any
3 current employees of BNSF?
4    A.  It's probably been over, maybe two years.
5    Q.   You don't socialize or keep in touch with
6 anybody from BNSF?
7    A.  No.
8    Q.  Okay.  Let's take a break.
9         (Recess)
10    Q.   (By Mr. Vogel)  A little clean-up, Mr.
11 Oropeza.  Did you ever hear anyone in your
12 leadership team, by that I'm including Mr.
13 Dickerson, Mr. Compton and Mr. Tylick, make any
14 comment that suggested that they were upset or
15 angry with you for taking FMLA leave?
16    A.  No.
17    Q.   Did anyone ever tell you they made such a
18 comment?
19    A.  No.
20    Q.   You indicated that you thought Daniel and
21 Mike took FMLA leave, did you have other work
22 acquaintances who you also understood also took
23 FMLA leave?
24    A.  No.
25    (Defendant's Exhibits 24 & 25 marked for

1         identification)
2    Q.   (By Mr. Vogel)  I just want to clean up
3 something we touched on this morning.  I'm going to
4 hand you what has been marked as Exhibits 24 and
5 25, and those are two letters, one is numbered for
6 production D-1339 dated August 8, 2007 and the
7 other is D-1341 dated November 6, 2007 to you from
8 Alden Jenkins, correct?
9    A.  Correct.
10    Q.   Those are the two letters we were talking
11 about earlier where Mr. Jenkins indicated that he
12 believed your pattern of FMLA use ran contrary to
13 the amount that you had been approved for, right?
14    A.  Yes.
15    Q.   Okay.  All right.  I actually usually go
16 through some discovery responses and some names of
17 witnesses, but I believe we have covered
18 individuals that you identify in your disclosures
19 and your Interrogatory responses, so we won't need
20 do that, but I want to talk to you about some of
21 the damages you're seeking from BNSF.  And one
22 thing I understand that you're asking for is lost
23 wages, correct?
24    A.  Correct.
25    Q.   And you're asking for lost wages for a

1 period of time where you were out of work and
2 didn't have a job at all, correct?
3    A.  Correct.
4    Q.   And then you're asking for a differential
5 between the amount of money you're making at the
6 job that you have now and the amount of money you
7 made at BNSF, is that right?
8    A.  Yes.
9    Q.   Okay.  So if I'm understanding some of
10 your responses correctly, and unless Mr. Thornberry
11 asks me to, I don't think I need to put them in the
12 record, you were unemployed from the end of
13 September 2014 until about the second week of May
14 in 2015, is that correct?
15    A.  That's correct.
16    Q.   A little more than seven months, right?
17    A.  Yes.
18    Q.   And the number that's estimated for the
19 amount of lost wages you had during that time was
20 about $42,000, does that sound accurate?
21    A.  I, I believe so, I don't know.
22    Q.   Okay.  Did you have, during the time that
23 you were unemployed, did you have any other sources
24 of outside income?
25    A.  No.

1   Q. And then in May of 2015, you got a job at
2 Ford, is that correct?
3   A. Yes.
4   Q. Is that at the Claycomo Missouri plant?
5   A. Yes.
6   Q. Are you a member of the UAW?
7   A. Yes.
8   Q. And are you a laborer there, is that how
9 they classify it, or are you in a special trade?
10   A. I think it's just line, whatever, I don't
11 know what, I don't know what's it called.
12   Q. You bid on jobs on the assembly line?
13   A. That's correct.
14   Q. And you get paid a pretty decent rate over
15 there, correct?
16   A. Not really.
17   Q. Really? Where's the UAW when you need
18 them? But you've gotten a couple of raises since
19 you've been there, right?
20   A. Yes.
21   Q. And at least according to your
22 disclosures, you make somewhere between 2,500 and
23 3,500 less at Ford per month than you made at BNSF,
24 is that right?
25   A. Correct.

1   Q. Okay. So your damages are continuing to
2 roll at somewhere in that 2,500 to 3,500 per month
3 range, right?
4   A. Yes.
5   Q. And are you also seeking any sort of
6 emotional distress damages from BNSF?
7   A. Yes.
8   Q. Okay. Have you sought any sort of
9 professional treatment for mental distress?
10   A. No.
11   Q. You haven't seen a counselor or anything
12 like that?
13   A. I just talk to my doctor when I go for a
14 physical.
15   Q. Who is your doctor?
16   A. Alexander Mallouk, I think it's
17 M-A-L-L-O-U-K.
18   Q. Where is Dr. Mallouk's practice?
19   A. St. Luke's.
20   Q. Over there by the plaza?
21   A. Yes, I think it's Wornall.
22   Q. Okay. By the way, just so I cover it, I'm
23 sure you're busy enough doing that, but other than
24 at Ford, you haven't worked anywhere else?
25   A. No.

1   Q. Do you remember taking a medical leave for
2 your own personal medical situation at the end of
3 May 2013 until close to the end of July 2013?
4   A. Yes, I was in a car accident.
5   Q. Okay. And so you had some limitations
6 following that accident that kept you out of work
7 for a little while?
8   A. Yes.
9   Q. Okay. Do those dates sound about right?
10   A. Yes.
11   Q. Okay. I don't have any other additional
12 questions for you today, Mr. Oropeza. Thanks for
13 your time and professionalism today?
14     MR. THORNBERRY: No questions. He'll read
15 and sign.

1   STATE OF MISSOURI
2
3        SS.
4   CITY OF ST. LOUIS
5
6    I, Margaret M. Perry, a Notary Public in
7 and for the State of Missouri, duly commissioned,
8 qualified and authorized to administer oaths and to
9 certify to depositions, do hereby certify that
10 pursuant to Notice in the civil cause now pending
11 and undetermined in the United States District
12 Court, Western District of Missouri, to be used in
13 the trial of said cause in said court, I was
14 attended by the aforesaid witness; and by the
15 aforesaid attorneys; on MAY 1, 2017.
16    That the said witness, being of sound mind
17 and being by me first carefully examined and duly
18 cautioned and sworn to testify the truth, the whole
19 truth, and nothing but the truth in the case
20 aforesaid, thereupon testified as is shown in the
21 foregoing transcript, said testimony being by me
22 reported in stenotype and caused to be transcribed
23 into typewriting, and that the foregoing pages
24 correctly set forth the testimony of the
25 aforementioned witness, together with the questions

Page 150

```
1   propounded by counsel and remarks and objections of
2   counsel thereto, and is in all respects a full,
3   true, correct and complete transcript of the
4   questions propounded to and the answers given by
5   said witness; that the signature of the deponent
6   was not waived by agreement of counsel.
7          I further certify that I am not of
8   counsel or attorney for either of the parties to
9   said suit, not related to nor interested in any
10  of the parties or their attorneys.
11         Witness my hand and notarial seal at
12  St. Louis, Missouri, this 12th day of May, 2017.
13         My Commission expires September 26, 2017.
14
15
16
17      Notary Public in and for the
18        State of Missouri
19
20
21
22
23
24
25
```

Page 152

```
1            Veritext Legal Solutions
             290 W. Mt. Pleasant Ave. - Suite 3200
2             Livingston, New Jersey 07039
             Toll Free: 800-227-8440  Fax: 973-629-1287
3
4   _____, 2017.
5   To: Stephen C. Thornberry, Esq.
6   Case Name: Frank A. Oropeza v. BNSF Railway Company
7   Veritext Reference Number: 2602614
8   Witness: Frank A Oropeza    Deposition Date: 5/1/2017
9
10  Dear Sir/Madam:
    Enclosed please find a deposition transcript. Please have the witness
11
    review the transcript and note any changes or corrections on the
12
    included errata sheet, indicating the page, line number, change, and
13
    the reason for the change. Have the witness' signature at the bottom
14
    of the sheet notarized except in California where they are signing
15
    under penalty of perjury and forward the errata sheet back to us at
16
    the address shown above.
17
18
    If the jurat is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21
    Sincerely,
22
    Production Department
23
24  Encl.
25  Cc:  David C. Vogel, Esq.
```

Page 151

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS
2          800-567-8658
    ASSIGNMENT NO. CS2602614
3   CASE NAME: Frank A. Oropeza v. BNSF Railway Company
    DATE OF DEPOSITION: 5/1/2017
4   WITNESS' NAME: Frank A Oropeza
5
    PAGE/LINE(S)/   CHANGE      REASON
6   ___/___/___   _____   ___/___
7   ___/___/___   _____   ___/___
8   ___/___/___   _____   ___/___
9   ___/___/___   _____   ___/___
10  ___/___/___   _____   ___/___
11  ___/___/___   _____   ___/___
12  ___/___/___   _____   ___/___
13  ___/___/___   _____   ___/___
14  ___/___/___   _____   ___/___
15  ___/___/___   _____   ___/___
16  ___/___/___   _____   ___/___
17  ___/___/___   _____   ___/___
18  ___/___/___   _____   ___/___
19  ___/___/___   _____   ___/___
20
         Frank A Oropeza
21  (Notary not required in California)
    SUBSCRIBED AND SWORN TO
22  BEFORE ME THIS_____DAY
    OF_____, 2017.
23
24   NOTARY PUBLIC
25  MY COMMISSION EXPIRES_____
```

39 (Pages 150 - 152)